**Steven MORRISON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 970–91.**

Court of Criminal Appeals of Texas, En Banc.

Dec. 16, 1992.

Rehearing Denied Jan. 27, 1993.

conjures up images of burning buildings and insurance fraud.

Annette K. Hanna, College Station, for appellant.

Bill Turner, Dist. Atty., and James W. Locke, Asst. Dist. Atty., Bryan, Robert Huttash, State's Atty., Austin, for State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

MALONEY, Judge.

Appellant was convicted of murder and punishment was assessed at confinement for fifty years in the Texas Department of Criminal Justice. On appeal, appellant complained of the trial court's practice of allowing jurors to question witnesses by means of submitting written questions to the court.[1] Appellant argued that this practice encourages jurors to become advocates. Appellant further contended that he was harmed because the juror's question, although ruled inadmissible, "tipped off" the prosecutor, prompting the State to offer additional evidence on a material issue.[2] The Tenth Court of Appeals declined to ban the practice of juror questioning of witnesses, but held that the juror's question in this case led to reversible error.[3]

■ We granted the State's Petition for Discretionary Review to determine whether "the court of appeals erred in holding that the trial court abused its discretion in allowing the State to recall a witness to produce evidence on a topic raised by a juror's question."[4] The State claims that

---

1. The trial judge instructed the jury that following each witness jurors could submit questions to the court to be asked of that witness. The court would rule on the questions outside of the presence of the jury. If a question was ruled admissible, the judge would recall the jury and read the question to the witness. The parties were allowed to ask follow-up questions of the witness, limited to the subject matter of the juror's question. Appellant objected to "the process" on the grounds that it is "not authorized by law." Appellant's objection was overruled, but appellant obtained a running objection to "the whole process."

2. We will briefly summarize the facts relevant to the juror's question. The victim brought appellant to her house to facilitate a drug transaction. Appellant and the victim began fighting in a bedroom and hallway inside the victim's house. Appellant eventually chased the victim from the house with a butcher knife. At trial, Detective Fickey, who investigated the crime scene, testified that he had found several drops of blood in a hallway in the victim's house. Following his testimony, a juror submitted the following question: "Was any of the blood in the hall [appellant's]?" Appellant's objection that the question called for a hearsay response was sustained and the question was never asked. However, the trial court allowed the State to recall Fickey, over objection, to question him about appellant's "physical well being" the night of the murder. The State asked Fickey whether he had observed "wounds, scratches or injuries" on appellant the night of the murder, to which Fickey responded that he had not.

3. The court of appeals determined that the trial court's practice of permitting juror questions essentially amounted to communication between jurors and counsel during trial, undermining the integrity of the judicial process. *Morrison v. State*, 815 S.W.2d 766, 768 (Tex.App.—Waco 1991). Concluding that the trial court had abused its discretion by allowing the State to strengthen its case based upon the communication from the juror, the court of appeals held that error here was per se harmful, as "an appellate court cannot determine beyond a reasonable doubt that an unfair advantage which the state gained from a juror's question did not contribute to either conviction or punishment." *Id.* at 769.

4. The Corpus Christi and Houston courts of appeal have also been grappling with the issue of juror questioning. *Velasquez v. State*, 815 S.W.2d 842, 845–46 (Tex.App.—Corpus Christi 1991) (procedure permitted); *Nichols v. State*, 815 S.W.2d 306, 307–08 (Tex.App.—Houston [1st Dist.] 1991, pet. granted); *Buchanan v. State*, 807 S.W.2d 644, 645–46 (Tex.App.—Houston [14th Dist.] 1991, pet. granted); *Allen v. State*, 807 S.W.2d 639 (Tex.App.—Houston [14th Dist.] 1991, pet granted). Accordingly, this issue is ripe for our review. TEX.R.APP.PRO. 200(c)(2).

We note that the issue of juror questions was before this Court previously in *Carr v. State*, 475 S.W.2d 755 (Tex.Cr.App.1972), *appeal dismissed and cert. denied*, 409 U.S. 1099, 93 S.Ct. 919, 34

the trial court's procedure for allowing juror questioning of witnesses "embodied virtually all safeguards" suggested by numerous other courts that have permitted the practice and argued that where procedural safeguards are adhered to, neither side gains an unfair advantage. The State further asserts that the practice does not lead jurors to become advocates, but aids in fully developing the evidence. Appellant essentially argues that the practice of allowing juror questioning distorts the jury's neutral factfinding role, leading jurors to assume the role of advocates. Appellant claims that juror questions amount to a form a communication between jurors and the parties which calls into question the integrity of the adversary system. We agree with appellant. To allow our adversary system to travel, without prior authorization, unregulated by statute or rule, in the direction encouraged by the trial court's practice is inconsistent with the principles underlying the system. Further, the dangers inherent in such a practice cannot be adequately circumvented by the imposition of procedural safeguards.

Resolution of the issue presented in this case turns upon our understanding of the adversary system.[5] The practice of juror questioning reflects the currently popular movement to downplay long-standing adversarial principles in favor of an intensified focus on truth-finding.[6] While we recognize that the search for truth is an integral part of the adversary process, other equally prominent features characterize our system. Addressing the multiple nature of our adversary system Justice Black wrote:

> A criminal trial is in part a search for truth. But it is also a system designed to protect "freedom" by insuring that no one is criminally punished unless the State has first succeeded in the admittedly difficult task of convincing a jury that the defendant is guilty.

*Williams v. Florida*, 399 U.S. 78, 113–14, 90 S.Ct. 1893, 1912, 26 L.Ed.2d 446 (1970) (concurring in part and dissenting in part). Due process and those individual rights that are fundamental to our quality of life co-exist with, and at times override, the truth-finding function.[7] These values be-

---

L.Ed.2d 682 (1973). Although we stated that we failed "to perceive how these questions permitted by the court without objection were improper or harmful", the point of error was multifarious and presented nothing for review.

5. The State points to numerous state courts which have permitted the practice of juror questioning of witnesses in various forms. Review of these opinions reflects that, in arriving at their decisions, most of these state courts entertained virtually *no* discussion of adversarial principles or of the problems presented to the jury's neutral role by the practice of juror questioning. *See, e.g., Nelson v. State*, 257 Ark. 1, 513 S.W.2d 496, 498 (1974); *People v. McAlister*, 167 Cal.App.3d 633, 213 Cal.Rptr. 271, 276–78 (1985); *Yeager v. Greene*, 502 A.2d 980, 985–86 (D.C.1985); *Ferrara v. State*, 101 So.2d 797, 800–01 (Fla.1958); *Story v. State*, 157 Ga.App. 490, 278 S.E.2d 97, 98 (1981); *Carter v. State*, 250 Ind. 13, 234 N.E.2d 650, 651–52 (1968); *Rudolph v. Iowa Methodist Medical Center, Inc.*, 293 N.W.2d 550, 555–56 (Iowa 1980); *People v. Heard*, 388 Mich. 182, 200 N.W.2d 73, 75–76 (1972); *Sparks v. Daniels*, 343 S.W.2d 661, 667 (Mo.App.1961); *State v. Rodriguez*, 107 N.M. 611, 762 P.2d 898, 901–902 (Ct.App.1988) (state statute authorizes the practice); *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn.Crim.App.1978).

6. Judge Benavides' dissent also indicates a willingness to join the current ranks of those whose intensified focus on truth-finding renders other adversary principles diminished importance.

7. Certain adversary values may effectively impede the discovery of truth by operating as evidentiary barriers to conviction. For instance, the fifth amendment privilege against self-incrimination eliminates a critical source of information that may shed light on the "truth". Monroe H. Freedman, *Judge Frankel's Search for Truth*, 123–2 U.Pa.L.Rev. 1060, 1063–64 (1975). Rules of evidence also operate to keep information from the jury. Legal commentators suggest that we have implemented such evidentiary barriers because we are more appalled by the conviction of an innocent person than by the acquittal of a guilty individual. *See, e.g.*, Marvin E. Frankel, *The Search for Truth: An Umpireal View*, 123–2 U.Pa.L.Rev. 1031, 1037 (1975); H. Richard Uviller, *The Advocate, the Truth, and Judicial Hackles: A Reaction to Judge Frankel's Idea*, 123–2 U.Pa.L. 1067, 1078 (1975); Mirjan Damaska, *Evidentiary Barriers to Conviction and Two Models of Criminal Procedure: A Comparative Study*, 121–1 U.Pa.L.Rev. 506, 508 (1973). Such barriers decrease the chance of conviction of an innocent person, but also increase the chance that a guilty person will escape conviction. Damaska, *Evidentiary Barriers*, 121–1 U.Pa.L.Rev. at 507.

In comparing the adversary process with inquisitorial systems, one legal commentator dis-

came intrinsic to the adversary process due largely to a general distrust of governmental power. *See, e.g., Apodaca v. Oregon,* 406 U.S. 404, 410, 92 S.Ct. 1628, 1632, 32 L.Ed.2d 184 (1972); *Duncan v. Louisiana,* 391 U.S. 145, 155, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968). Evidentiary barriers to conviction exist, in part, to equalize the contest between the state and the defense by offsetting the abundant resources and power of the state.[8]

Establishment of the jury as a neutral and passive fact-finder in the adversary process paralleled the movement to safeguard individual rights against governmental oppression.[9] *Duncan,* 391 U.S. at 156, 88 S.Ct. at 1451. The desire for the jury to stand as a body independent of governmental influence led to defined roles among participants in the system. The adversary theory as it has prevailed for the past 200 years maintains that the devotion of the participants, judge, juror and advocate, each to a single function, leads to the fairest and most efficient resolution of the dispute. Stephan Landsman, *The Adversary System, a Description and Defense* (1984). Party responsibility for the production of evidence insulates the jury, to the greatest extent possible, from the contest. *Id.*

The practice of juror questioning of witnesses is most disturbing in its potential for undermining these mainstays of the adversary process. As eloquently stated by 8th Circuit Chief Judge Lay, *"[t]he fundamental problem with juror questions lies in the gross distortion of the adversary system and the misconception of the role of the jury as a neutral factfinder in the adversary process."* *United States v. Johnson,* 892 F.2d 707, 713 (8th Cir.1989) (concurring opinion) (emphasis added).[10]

cussed how the two systems differently "resolve the conflict between efficient pursuit of the truth and protection of values such as human dignity and privacy and the preservation of a general atmosphere of freedom". *Id.* at 579. It is his contention that the system placing a high value on human dignity and privacy will remain committed to those values even at the expense of truth. A more truth-oriented system is less willing to establish evidentiary barriers that are independent of the truth-finding function. Further, the more committed a system to truth as its paramount purpose, the less tolerant it will be of acquitting the guilty in order to prevent conviction of the innocent. *Id.* at 579–80.

8. In the words of Justice Black:
The Framers [of the Constitution] were well aware of the awesome investigative and prosecutorial powers of government and it was in order to limit those powers [that] they spelled out in detail in the Constitution the procedure to be followed in criminal trials. A defendant, they said, is entitled to notice of the charges against him, trial by jury, the right to counsel for his defense, the right to confront and cross-examine witnesses, the right to call witnesses in his own behalf, and the right not to be a witness against himself. All of these rights are designed to shield the defendant against state power. None are designed to make convictions easier and taken together they clearly indicate that in our system the entire burden of proving criminal activity rests on the State. The defendant, under our Constitution, need not do anything at all to defend himself, and certainly he cannot be required to help convict himself. *Rather he has an absolute, unqualified right to compel*

the State to investigate its own case, find its own witnesses, prove its own facts, and convince the jury though its own resources.
*Williams,* 399 U.S. at 112, 90 S.Ct. at 1911–12 (concurring in part and dissenting in part).

9. Adversary method and philosophy as it is generally known today developed in England primarily during the 17th and 18th centuries. Development of the system was propelled by a variety of largely social influences, including the English reform movements of the 1760's and 1770's which used the legal system to address numerous social injustices of the day, scholarly writings on the adversarial nature of trials, scholastic reconceptualization of the rules of evidence, "the rise of dynamic individualism [and] the growth of a market economy". Stephan Landsman, *The Rise of the Contentious Spirit: Adversary Procedure in Eighteenth Century England,* 75 Cornell L.Rev. 497, 572–603 (1987).
Juries have been viewed as intrinsic to life in a "free" society:
... trial by jury is more than an instrument of justice and more than one wheel of the constitution: it is the lamp that shows that freedom lives.
*Duncan,* 391 U.S. at 155–56 n. 23, 88 S.Ct. at 1451 n. 23 (quoting P. Devlin, Trial by Jury 164 (1956)). In continental systems, where a concern for human dignity and the preservation of individual rights is less prominent, the jury is notably absent.

10. Although federal courts allow the practice of permitting jurors to question witnesses, they nevertheless recognize its inherent dangers.

*See, e.g., United States v. Lewin,* 900 F.2d 145, 147 (8th Cir.1990) (the court recognized "considerable merit" in appellant's argument that juror questioning was disruptive, invited speculation and "distorted the role of the jury in the adversarial process"); *United States v. Nivica,* 887 F.2d 1110, 1123 (1st Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990) (risks of juror questioning of witnesses in a criminal case"); *DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d 512, 516–17 (4th Cir.1985). The Fourth Circuit has discussed at length the pitfalls of the practice, stating:

> Notwithstanding our belief that juror questioning is a matter within the trial court's discretion, we believe that the practice of juror questioning is fraught with dangers that can undermine the orderly progress of the trial to verdict. Our judicial system is founded upon the presence of a body constituted as a neutral factfinder to discern the truth from the positions presented by the adverse parties. The law of evidence has as its purpose the provision of a set of rules by which only relevant and admissible evidence is put before that neutral factfinder. Individuals not trained in the law cannot be expected to know and understand what is legally relevant, and perhaps more importantly, what is legally admissible. Since jurors generally are not trained in the law, the potential risk that a juror question will be improper or prejudicial is simply greater than a trial court should take, absent such compelling circumstances as will justify the exercise of that judicial discretion as set out above.

*DeBenedetto,* 754 F.2d at 516–17.

Some federal courts have justified tolerance of juror questioning on the grounds that judicial interrogation of witnesses is generally permitted. While Federal Rule of Evidence 614 permits judicial interrogation of witnesses, federal appellate courts have cautioned district courts on the dangers inherent in the practice. *See, e.g., United States v. Beaty,* 722 F.2d 1090, 1095 (3rd Cir.1983) (judge must be "extremely careful" to minimize questioning; *United States v. Barbour,* 420 F.2d 1319, 1321 (D.C.Cir.1969). As stated by the D.C. Circuit, judges should be constrained to hold questions to a minimum because "[i]nterrogation of witnesses tends to assimilate the court's role with the advocate's, and may tread over the line separating the provinces of judge and jury." *Barbour,* 420 F.2d at 1321 (citations omitted). Citing opinions of other circuits, the court further asserted that "[t]here is the risk that the questioning may bear 'the seeds of tilting the balance against the accused' and place 'the judge in the eyes of some jurors on the side of the prosecution' ". *Id.* (citations omitted).

While recognizing that Texas is "second to none" in its disapproval of the nonadversarial practice of trial judges' examination of witnesses and that Texas is virtually alone in rejecting adoption of Federal Rule of Evidence 614 which authorizes trial judges to call and interrogate witnesses, Judge Benavides in his dissent nevertheless asserts that juror questioning should be allowed because judicial questioning of witnesses has been tolerated. However, the cases cited by Judge Benavides in support of this proposition do not represent wholesale and unquestioned approval of judicial questioning nor do they justify extension of the practice to jurors.

Judge Benavides cites ten cases in his dissent in which this court under limited circumstances allowed questioning of witnesses by judges. A primary concern in allowing active participation by judges is the danger that the judge will somehow convey his opinion of the case to the jury and ultimately influence their decision. *See* Article 38.05 V.A.C.C.P.. In most of the ten cases cited, the questioning did not occur during the course of a trial in the presence of the jury. Therefore, the danger that any apparent bias would influence the jury was not present. In two of the cases cited, the questions propounded by the judge were done so at probation revocation hearings where defendants are not entitled to a jury and where no objection had been made to the questioning. *Brewer v. State,* 572 S.W.2d 719 (Tex.Cr.App.1978); *Munoz v. State,* 485 S.W.2d 782 (Tex.Cr.App.1972). In two other cases cited, the defendant was before the trial court on a plea of guilty. *Cleveland v. State,* 588 S.W.2d 942 (Tex.Cr.App.1979); *Navarro v. State,* 477 S.W.2d 291 (Tex.Cr.App.1972). Another of the cases cited was a bench trial. *Marshall v. State,* 164 Tex.Crim. 167, 297 S.W.2d 135 (1957) (holding that since the trial was before the court without a jury, the questions did not result in harm to the appellant). Two of the cases clearly involved questions to which the judge would need answers in order to make a ruling. *Milo v. State,* 152 Tex.Crim. 405, 214 S.W.2d 618 (1948) (although recognizing that the court should normally refrain from asking questions, it was permissible here to aid the court in its determination of admissibility of evidence); *Rodrigues v. State,* 110 Tex.Crim. 267, 8 S.W.2d 149 (1928) (although recognizing that the judge should refrain from asking questions of the witnesses, such questions were permissible here to aid court in determination of venue issue). In another of the cases cited, the trial judge asked the witness a question because he did not hear what the witness had just stated. *Ash v. State,* 420 S.W.2d 703 (Tex.Cr.App.1967). In another of the cases cited, the objections were directed at the court's explanations to veniremen of questions being asked them during voir dire. *Enriquez v. State,* 429 S.W.2d 141 (Tex.Cr.App.1968). *Only one of the ten cases cited by the majority involved judicial questioning in an effort to elicit facts unrelated to an issue of law in the normal course of a jury trial. Stewart v. State,* 438 S.W.2d 560 (Tex.Cr.App. 1969).

In five of the seven court of appeals cases cited by Judge Benavides, the judicial comments were either made outside the presence of the jury during a jury trial or the comments were made during the course of a bench trial. *Burks*

To allow active juror participation in the presentation of evidence encourages jurors to depart from their role as passive listeners and assume an active adversarial or inquisitorial stance. Such participation inevitably leads the inquirer to draw conclusions or settle on a given legal theory before the parties have completed their presentations, and before the court has instructed the jury on the law of the case.[11] Although it is impossible to guarantee that jurors will remain open-minded until the presentation of all of the evidence and instructions, passive detachment increases that probability. *Johnson*, 892 F.2d at 713.

Given the importance of maintaining juror impartiality as fundamental to adversarial integrity,[12] any redefining of the juror's role in the process must be undertaken only when the benefits are exceedingly clear.[13] The benefits of allowing jurors to participate in soliciting evidence are far from clear and fade to insignificance in light of the perils presented to adversarial principles.[14]

v. State, 693 S.W.2d 747 (Tex.App.—1985); *Silva v. State*, 635 S.W.2d 775 (Tex.App.—Corpus Christi 1982); *Bautista v. State*, 632 S.W.2d 846 (Tex.App.—Houston [14th Dist.] 1982); *Richardson v. State*, 632 S.W.2d 700 (Tex.App.—Fort Worth 1982); *Voelkel v. State*, 629 S.W.2d 243 (Tex.App.—Fort Worth 1982). In another of the seven cases cited, no objection had been made to the questioning. *Ross v. State*, 800 S.W.2d 262 (Tex.App.—Houston [14th Dist.] 1990). In another of the seven cases cited, the trial judge did not ask questions of any witnesses, but merely made comments to counsel in an effort to preserve orderly proceedings. *Betancourt v. State*, 657 S.W.2d 451 (Tex.App.—Corpus Christi 1983).

11. Fellow jurors who are likely to give greater weight to questions asked by another jury member than by the lawyers responsible for presenting the evidence may also be inclined to draw premature conclusions. *DeBenedetto*, 754 F.2d at 516–17.

12. In addition to the real distortion of adversarial principles resulting from the practice of allowing jurors to participate in the presentation of evidence, the jurors' assumption of any role other than that of an impartial and indifferent listener calls into question the integrity of the system by giving the appearance that the jury may not be maintaining its impartiality. Although judge and juror each operate within distinct and clearly defined roles, they share the common goal of striving to maintain impartiality in order to preserve the integrity of the system. As stated by Justice Frankfurter in referring to a judge who appeared biased against one of the parties during a trial, "[t]hese are subtle matters, for they concern the ingredients of what constitutes justice. Therefore, *justice must satisfy the appearance of justice." Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954) (emphasis added).

13. A change of this nature may best be facilitated legislatively. The Code of Criminal Procedure sets forth numerous rules of procedure applicable to juries with considerable detail. For instance, the Code provides that juries are to be the exclusive finders of fact, Articles 36.13, 38.04 V.A.C.C.P., prohibits anyone from conversing with the jury during deliberations, Article 36.22 V.A.C.C.P., describes what the jury may take with them into the jury room, Articles 36.18, 36.25 V.A.C.C.P., provides a method by which juries may communicate with the court after they receive the case, Article 36.27 V.A.C.C.P., and allows jurors during deliberations to have trial testimony read from the notes of the court reporter or a witness re-examined if a reading is not possible, Article 36.28 V.A.C.C.P. Significant attention is given to the formation of the jury. Article 35.01 et. seq. V.A.C.C.P. Many of the Code's provisions applicable to juries are clearly designed to foster impartiality.

14. Studies on the practice of permitting jurors to question witnesses have shown that the alleged benefits of the practice are marginal at best, and the detrimental effects are elusive of measurement. Note, *Breaking the Silence: Should Jurors be Allowed to Question Witnesses During Trial?*, 44 Vand.L.Rev. 117, 140–42 (1991). In one of the most extensive studies conducted on the matter, the theoretical advantages of permitting juror questions were stated as the following:

(1) it would ensure that the jury had all the relevant information to reach a just verdict; (2) it may uncover evidence left out by the attorneys; (3) it increases juror participation; and (4) it would alert attorneys to areas which need to be developed or clarified.

Jeffery Reynolds Sylvester, *Your Honor, May I Ask a Question? The Inherent Dangers of Allowing Jurors to Question Witnesses*, 7 Cooley L.Rev. 213, 223 (1990) (discussing study conducted by Larry Huer of the Dispute Resolution Center at Northwestern University and Steven Penrod of the University of Wisconsin–Madison). The theoretical disadvantages were set forth as the following:

(1) jurors could lose their objectivity and become overinvolved; and (2) jurors might ask improper questions.

*Id.* The study was based on real trials in which jurors were allowed to submit written questions to the judge who screened the questions. Note, *Breaking the Silence*, 44 Vand.L.Rev. at 140–41.

The State emphasizes the imposition of procedural safeguards, apparently presuming that judicial control will effectively eliminate any danger presented to adversary values.[15] Although some of the pitfalls of the practice may be avoided pursuant to strict procedural safeguards, numerous other procedural and theoretical implications remain unanswered.[16] For instance, what is the permissible scope of juror questions? Should jurors be told of the reasons for exclusion of a submitted question? Should a witness be recalled if a juror thinks of a question after that witness has been dismissed? If a juror's questions indicate that the juror is becoming prematurely partial should the judge declare a mistrial? Should jurors be allowed to question a defendant who chooses to take the stand? Especially troublesome is the possibility that juror partiality may arise as the result of a single question or may arise in one juror as a result of another's questions, however impartial those questions may appear.[17]

The questionable benefits of such a practice do not outweigh the far-reaching hazards presented to other values intrinsic in the system. *Accord State v. Barrett*, 297 S.E.2d 794, 796 (1982), *cert. denied*, 460 U.S. 1045, 103 S.Ct. 1445, 75 L.Ed.2d 800 (1983). Absent a thorough legislative mandate in this area, courts should not experiment.[18] A change in our system involving

Although the study found that jurors believed their questions elicited additional information, results indicated that the jurors' questions did not elicit previously undisclosed evidence and were only moderately helpful. Jeffery Reynolds Sylvester, *Your Honor, May I Ask a Question?*, 7 Cooley L.Rev. at 223; *see also* Note, *Breaking the Silence*, 44 Vand.L.Rev. at 141 (Huer, Penrod study revealed that the "belief that jury questions uncover pertinent and helpful information has been exaggerated. Benefits in this areas were modest at best"). Significantly, the study found that the subjective nature of the potential disadvantages rendered it impossible to measure those propositions at all. Jeffery Reynolds Sylvester, *Your Honor, May I Ask a Question?*, 7 Cooley L.Rev. at 223–24.

15. Judge Benavides, in his dissent, also concludes that when juror questioning is subject to conscientious judicial control, "the fundamental values of our adversary system are not compromised" and premature commitment by jurors can be avoided. Judge Benavides' belief that premature impartiality can somehow be circumvented by screening the number or manner of questions submitted assumes that such impartiality will be so obvious as to be clearly reflected in the questions asked. We think it more likely that juror impartiality is generally elusive of detection or measurement and for this reason any practice which may impart impartiality should not be condoned.

16. Courts and legal scholars addressing this issue agree that the procedural difficulties arising from juror questioning of witnesses include: (1) placement of attorneys in the awkward position of deciding whether to object to an inappropriate question at the risk of offending or alienating the juror and arousing suspicion, or to not object and risk admission of irrelevant or damaging evidence, foregoing the preservation of the error; (2) determination of the scope of the juror's question—should questions be limited to issues already raised by the evidence presented or may questions raise new issues; (3) the asking of inappropriate, prejudicial or irrelevant questions due to the juror's lack of legal training; and (4) further slowing of the already sluggish and cumbersome trial process. *See, e.g., DeBenedetto*, 754 F.2d at 516; *State v. Zima*, 237 Neb. 952, 468 N.W.2d 377, 379 (1991); *see also* Jeffery S. Berkowitz, Note, *Breaking the Silence: Should Jurors be Allowed to Question Witnesses During Trial?*, 44 Vand.L.Rev. 117, 120–21 (1991); Michael J. Wulser, Comment, *Should Jurors be Allowed to Ask Witnesses Questions in Criminal Trials?*, 58 UMKC L.Rev. 445, 451–59 (1990). The procedures employed by the trial court in this case eliminated the attorney's dilemma of deciding whether or not to object to the question in the presence of the jury.

17. As noted by Judge Lay, the practice of juror questioning leads to unfairness of a "subtle and psychological nature that is difficult to identify with particularity." *Johnson*, 892 F.2d at 711 n. 1.

18. We note that Texas' staunch loyalty to adversarial principles has been demonstrated in its stated disapproval of the nonadversarial practice of trial judges' examination of witnesses and in its rejection of Federal Rule of Evidence 614 which authorizes judges to call and interrogate witnesses. As recognized by Judge Benavides in his dissenting opinion, every state which has enacted a state version of the federal rules of evidence has adopted some version of Rule 614 with the exception of Oregon and Texas. Neither has Texas chosen to enact a rule authorizing the interrogation of witnesses by jury members. This absence indicates that the rule making authorities did not intend to endorse or authorize questioning of witnesses by judges or jurors.

intrusion of one component into the function of another may only be established through the limited rule making authority of this court, subject to disapproval by the legislature or by the legislature in accordance with due process. We know of no authority establishing or authorizing jurors to ask questions of witnesses in the criminal jurisprudence of this state and therefore find the same to be error.

█ The State contends that the practice of juror questioning in the instant case was "of negligible value" and therefore error, if any, was harmless. Where the role of the jury as a neutral fact-finding body is significantly modified, the underpinnings of our system, designed to ensure trial by a fair and impartial jury are likewise compromised. A determination of harm in this context is virtually impossible. Accordingly, we hold that the practice of permitting jurors to become active participants in the solicitation of evidence by questioning witnesses is not subject to a harm analysis. We affirm the judgment of the court of appeals.

MILLER, J., joins the judgment and opinion of the majority with the following note: The harm analysis question is not completely settled in my mind, but the issue concerning the practice of allowing juror questions needs resolution, thus I join the majority opinion. If the legislature, who has the responsibility of enacting criminal procedure for this state, wishes to allow the practice of juror questioning, they are certainly free to do so.

CLINTON, Judge, concurring.

At least twenty years ago, an accused representing himself stood mute when the late Judge E.E. Jordan allowed one or more jurors to question witnesses about "the fact that he was unable to make an identification of the [accused] as the man he saw [leaving the scene of the crime]." The Court "fail[ed] to perceive how these questions permitted by the court *without objection* were improper or harmful to the [accused]." *Carr v. State*, 475 S.W.2d 755, at 757 (Tex.Cr.App.1972), appeal dismissed and cert. denied, 409 U.S. 1099, 93 S.Ct. 919, 34 L.Ed.2d 682 (1973).[1]

Although Judge Jordan apparently continued to indulge inquisitive jurors wherever he sat, see *Pless v. State*, 576 S.W.2d 83 (Tex.Cr.App.1978), and some other trial judge was permitting jurors to pose questions to witnesses as a matter of local practice on the strength of *Carr*, the fact is that the few instances where *Carr* is cited in any subsequent appellate opinion relate to some other point. See Shepard's Texas Citations. In short, there is no appellate evidence that juror questioning ever became a localized common practice anywhere in this jurisdiction—until recently.

We know that lately the judge of the 272nd Judicial District Court of Brazos County instituted a structured form of the same practice. See *Buchanan v. State*, 807 S.W.2d 644, 645–646 (Tex.App.—Houston [14th] 1991) PDR granted; *Allen v. State*, 807 S.W.2d 639 (Tex.App.—Houston [14th] 1991) PDR granted; *Nichols v. State*, 815 S.W.2d 306, 307–308 (Tex.App.—Houston [1st] 1991) PDR granted; *Morrison v. State*, 815 S.W.2d 766, 767–769 (Tex. App.—Waco 1991), PDR granted; *Wilson v. State*, 823 S.W.2d 777, 781–782 (Tex. App.—Waco 1992), PDR granted; *Fazzino v. Guido*, 836 S.W.2d 271, 275–276 (Tex. App.—Houston [1st] 1992) (civil action).[2] So did the judge of the 347th Judicial District Court of Nueces County in *Velasquez*

---

1. The opinion indicates there were weightier issues in the case, particularly concerning the matter of selfrepresentation. *Id.*, at 758. While persistent in his efforts for vindication, Carr fared no better—without or with counsel. See *Carr v. Estelle*, 489 F.2d 1402 (CA5 § 974) (*pro se*); *Ex parte Carr*, 511 S.W.2d 523 (Tex.Cr.App. 1974) (abuse of writ). Ironically, he exhausted his remedies the year *before Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

All emphasis above and throughout this opinion is mine unless otherwise noted. All references to "dissent" and "dissenting opinion" are to the dissenting opinion by Judge Benavides.

2. As well as allowing juror questioning, the judge has also introduced a formalized procedure for juror notetaking. His explanations of both are reproduced from the *Morrison* record, I S.F. 1, at 6–10, and appear in Appendix 1, attached hereto.

*v. State,* 815 S.W.2d 842, 845–846 (Tex. App.—Corpus Christi 1991) no PDR history. We are permitted to infer that one or both judges took guidance from *United States v. Callahan,* 588 F.2d 1078, 1086 (CA5 1979), and cases cited therein, rather than the dormant *Carr* case, in that the former spells out a similar procedure utilized in the United States District Court for Middle District of Georgia, *id.,* at 1086, whereas the latter hardly purports to teach any clear lesson on the subject.[3]

In any event, suddenly we have a rash of cases concerning a procedure initiated *sua sponte* below, presenting a question of first impression in this jurisdiction. See C. Randall Michel, *Should Jurors Be Allowed to Pose Written Questions to Witnesses During a Trial?,* 55 Texas Bar Journal (November 1992) 1020. The dissent correctly characterizes those initiatives as "experimenting with such methods [allowing jurors to ask questions];" yet it recognizes and acknowledges that "[r]ecent studies ... have not supported [the] hypothesis [proponents advance to justify them]." At 904, and n. 9.

The threshold question to me, then, is basic and fundamental: Since the Legislature has never spoken to sanction it, what public purpose does this Court serve by granting its imprimatur to continued judicial "experimentation" with methods risking revival of a former medieval practice, when results even now are demonstrably so fraught with potential impropriety and ambiguous benefit as to render further experimentation without worth or merit?

The dissent suggests that "it is not inappropriate that legal systems sometimes be allowed to evolve in response to preferred methods of judges or practitioners." At 903. The truth of history, however, is that a long evolutionary process, first abroad and then here, transformed the jury from an active "instrument of royal inquiry" to a "neutral and passive fact finder."[4] In this

---

3. Our own appellate courts have made such varied interpretations of the *Carr* treatment that there is no settled view of it.

The *Buchanan* court observed that "when presented with the question ... [the Court] did not denounce the idea when given the opportunity." *Id.,* at 645. Noting appellate procedural defaults, failure to object at trial and comments in *Carr,* nevertheless the *Buchanan* court remained impressed with inaction, *viz:*
"... The court could have condemned the entire procedure regarding jurors questioning witnesses. It chose not to do so. *We find this telling.*"
*Ibid.*
*Allen* was handed down the same day by another panel of the Houston [14th] Court; it took a decidedly different approach, *viz:*
"This is a case of first impression in Texas. See *Buchanan v. State,* 807 S.W.2d 644 (Tex. App.—Houston–[14th] 1991) (same issue). Although there is no case law in Texas which directly supports or condemns the practice of jurors asking questions to witnesses, foreign authorities which have addressed this issue are virtually unanimous in permitting it."
*Id.,* at 640. It proceeded to review those authorities, returning to *Carr* to notice that even though the Court "disposed of the issue by holding that the appellant's question presented a multifarious ground for review, the court stated that allowing jurors to ask witnesses questions did not appear improper or harmful *where there was no objection.*" *Id.,* at 642. In *Allen,* however, there was objection.

The *Nichols* court also noted that *Carr* found defendant waived any error, "but the court nevertheless *held* the particular questions harmless;" from that reading and on the strength of *Buchanan* and *Allen,* both supra, the Houston [1st] Court concluded there was no harm in the single question and answer. *Id.,* at 307.

In the instant *Morrison* cause, the Waco Court simply ignored *Carr.*

The Corpus Christi Court strictly read *Carr, viz:*
"Until recently, this practice had been virtually unknown in Texas and its legitimacy is uncertain. Cf. *Carr v. State,* 475 S.W.2d 755, 757 (Tex.Crim.App.1972) (legitimacy of juror questions was raised but not addressed because the point of error was multifarious and presented nothing for review)."
*Velasquez,* supra, at 846.

Neither *Wilson* nor *Fazzino* mentions *Carr.*

4. In England, through centuries of experience, the initial investigative or inquisitorial role of the jury evolved to a neutral and passive fact-finding role within the adversary system. S. Landman, *The Adversary System, A Description and Defense* (American Enterprise Institute for Public Policy Research 1984) 7, 10–19. Our own forebearers in this country insisted on the right to trial by jury, and then over the years developed their own notions of judicial neutrality and passivity, firming them up by, *inter alia,* expanding rules of evidence "designed to safeguard the neutrality and passivity of the fact finder." *S. Landman,* supra, at 19–22. Careful and strict appellate review served to "establish

jurisdiction the very fact that there is no indication anywhere that our Texas jurisprudence ever positively tolerated questioning by *jurors* should suffice to show that

thus far we have demanded and required the jury to remain neutral and passive.[5] And the further fact is that in this cause,

the adversarial principle that trial activity would have to conform to the rules vesting the litigants with control of the process and securing the neutrality and passivity of the fact finder." *Id.,* at 22–23.

**5.** The dissent skips over significance in the fact that unlike all other jurisdictions except Oregon, "Texas, in stark contrast, has rejected [Fed. R.Evid.] Rule 614 altogether," to take comfort in its reading of our cases prior to the Rules of Criminal Evidence to the effect that "this Court has often *approved* the practice of trial judges propounding questions to witnesses called by the parties[.]" at 903. Well, not exactly.

Those who accept that trial judges have authority to question witnesses are so sensitive to recognized recurrent misuse as to immediately add caveats against abuse of that authority. See, e.g., Notes of Advisory Committee on 1972 Proposed Rules pertaining to Fed.R.Evid. 614, subdivision (b) (because manner in which interrogation should be conducted and proper extent of its exercise are not susceptible of formulation in a rule, such omission "in no sense precludes courts of review from *continuing* to reverse for abuse").

The history of abuse in exercising that authority informed the State Bar Liaison Committee on Rules of Evidence in reaching its "consensus" that "well-entrenched policies encouraging the trial judge to maintain an impartial posture in the trial should not be eroded by a rule specifically allowing the court to participate in calling and interrogating witnesses." Black, *Article VI: Witnesses,* 20 Houston L.Rev. 409, at 443 (1983 Tex.R.Evid. Handbook). On the criminal side, fears from experience that exercise of that authority was being abused contributed to the "consensus." Most especially noteworthy is that neither the Supreme Court nor this Court overruled the committee.

Under the aegis of Article 38.05, V.A.C.C.P. and its predecessors dating back to 1879, the Court rather consistently adhered to the position that "it [is not] any part of the duty of a judge to take in hand the examination or cross-examination of witnesses." *Harrell v. State,* 39 Tex.Cr.R. 204, 45 S.W. 581, 586 (1898). Judge Henderson explained the rationale for the Court, *viz:*

"... These functions belong to the respective counsel on either side, and it is presumed they know how to discharge their duties properly. If they do not comply with the rules in regard to the examination and cross-examination of witnesses, it is the duty of the court to see that they comply. It may be the province of the court sometimes to inquire of a witness as to some statement made by him for

a clearer understanding on the part of the court, but it can never pertain to him to interfere in the case, and take the examination of a witness out of the hands of counsel whose business it is to conduct the examination. As to a matter of this character, the court should studiously abstain from interfering. He should avoid even the appearance of partiality. It would be almost impossible for the court to take part in the examination of witnesses without impressing the jury with the belief that the court believed or disbelieved the testimony of the witnesses, whether the court intended to make such an impression or not. Our Code of Criminal Procedure of 1895 is very particular in this regard. [Quoting Article 767]. Now, in the examination of a witness, however fair-minded the judge may be, it would be almost impossible for him to so conduct it as not to suggest in some measure that he is on one side or the other.... By carefully attending to his own duties and conserving his own functions, he will best be able to hold the scales of justice impartially as between counsel who are managing the case for and against the state; and, wherever he does interfere, it is generally at the expense of his own authority and dignity, which should be rigidly guarded, in order that he may administer the law with fairness and impartiality, and with that authority and power which pertains to the office. We cannot commend the action of the judge in his attempt to interfere with the province of counsel for the state in the examination of witnesses, and, if it appeared to us that such interference on his part was calculated to prejudice the rights of the appellant, we would not hesitate to reverse this case. Such interference on the part of a judge can never be called for, and especially in this case, where both the state and the defendant were represented by able counsel, it was absolutely unwarranted."

*Id.,* 45 S.W. at 586–587. *Accord: Hopperwood v. State,* 39 Tex.Cr.R. 15, 44 S.W. 841, at 842 (1898); *Drake v. State,* 65 Tex.Cr.R. 282, 143 S.W. 1157, at 1160 (1912) (cautioning trial judges about engaging in this practice and developing evidence which had not theretofore been elicited in the case, so as to prevent reversals of future cases); *Rodrigues v. State,* 110 Tex.Cr.R. 267, 8 S.W.2d 149, at 150 (1928) (court should refrain from active participation in examination of witnesses lest reversal result when injury is shown); *Poole v. State,* 113 Tex.Cr.R. 343, 21 S.W.2d 529, at 531 (1929) (iterating its "disapproval of the examination of witnesses by the trial court" as likely to violate statute).

It is true, as the dissent points out at 903–04, n. 6, the Court has said no error is committed

as well as the others, by objecting at trial and protesting on appeal practitioners have demonstrated the "method" at issue is not "preferred."

That this Court would now sanction local introduction of an experimental procedure not authorized in this jurisdiction by any source in the order of hierarchical governance, thereby creating acknowledged risks of the jury as an institution asserting or assuming a retrogressive role, cannot be justified by seeking an abstract accommodation of perceived tensions between "an adversarial system" and "the truth-finding process." Dissenting opinion, at 903, 904, 905, and 906. The issue is real; the experiments affect rights.

It is simply not realistic to suggest that the spectacle of jurors questioning witnesses is one of those "nonadversarial methods long accepted in practice and by now an established part of our authoritative decisional law," dissenting opinion at 904, when the evidence collected in scholarly studies fails to bear out "the supposition of its proponents that an organized approach . . . will facilitate resolution of factual disputes by clarifying the testimony, identifying issues requiring further development, and increasing juror attention to the evidence," *id.*, at 904, n. 10. Nor is it realistic to suppose that "such participation [will be] conscientiously subjected to the kind of *judicial control* which effectively prevents advocacy or premature committment [sic]

by the jurors," at 904, in the face of recurring cases replete with episodic *loss of judicial self-control* in the premises, such that a consensus of judges, practitioners and scholars composing the State Bar Liaison Committee on Rules of Evidence rejected a rule specifically allowing judges to participate in interrogating witnesses, and neither the Supreme Court nor this Court were all that sanguine about the practice. See note 5, *ante.*

Nonetheless, with the aid of assorted law review comments and notes, the dissent perceives submission of questions from the jury as a "truth-finding" measure or method—whenever "scrupulously subjected to normal adversarial examination and . . . conducted in such a way that jurors do not become advocates for either side." Slip opinion, at 6. But because during voir dire or just before the indictment is read the judge instructs venirepersons or jurors as to their gratuitous privilege to submit questions, e.g., *Allen*, at 640; *Morrison*, at 767; *Velasquez*, at 845; *Fazzino*, at 275, there is no assurance that, thus anticipating the opportunity, a juror who takes advantage of it during the course of trial has not already become an advocate for one side or the other.[6] One may speculate but hardly be sure about the intended meaning of a question and whether it indicates an attitude of a juror.[7] Moreover, four of the seven recent cases reflect a consensus view that whatever information inquiring fact-

---

when a trial judge is "seeking information only." *Ash v. State,* 420 S.W.2d 703, 705 (Tex. Cr.App.1967). But there is complementary rationale for disapproving questioning of witnesses by a trial judge even seeking "information," *viz:* the right of an accused to a free, fair and full presentation of evidence through witnesses "should not be unduly constrained or curtailed[.]" *Jackson v. State,* 167 Tex.Crim. 34, 318 S.W.2d 98, 102 (1958) (on motion for new trial).

**6.** The dissenting opinion in *Buchanan* sets out several questions presented seemingly by more than one juror for two witnesses for the State and one witness for defendant, and then evaluated their answers, finding at least some favored the State. *Id.,* at 647–648. At this distance we cannot identify every character in the cast, except the undercover officer running the "*sting operation*," and to assay related questions and answers is not for me. It does appear, however, from the manner of framing some

questions that the interrogator was relying on personal knowledge in putting the question, and in that sense became a "third party" advocate.

A juror asked State's witness Lyles: "Did he take the boat and trailer home to make the trailer street legal?" A juror wanted to know from Officer Jones, "What was the serial number of the motorcycle purchased at the shop?" and "What is the serial number of the motorcycle that was reported missing?" A juror asked defendant's witness Green: "Kon Tiki Lounge is on the other side of Texas Avenue than what Chris Green is saying. He would have to cross Texas Avenue to go to the west side of town. Am I mistaken?"

Whether such questions came from a "neutral and passive factfinder" I leave to the Court to determine in due course.

**7.** For example, in *Nichols* before the question quoted at 307, proposed to a witness for the State, was read to the jury, there was the following colloquy:

finders received was not revealed "truth" of consequence; in two, however, a dissenter stoutly disagreed.[8]

Furthermore, apparently the trial judges (and the dissent here) did not contemplate ramifications of the situation *where the witness is the defendant.* The record in *Nichols* does not reveal content of the question presented by a juror but makes evident the consternation that can result.[9]

Finally, it is clear enough to any litigator that the whole process from initial instruc-

> "THE COURT: I want you to look at the question. Does the State have any objection to the question being asked this witness?
>     \*   \*   \*   \*   \*   \*
> [STATE]: No.
> THE COURT: Does the defense?
> [DEFENSE]: I *don't understand* their question.
> THE COURT: I'm *not sure I understand* it either, but that's *all right.*
> [STATE]: *I do.*
>     \*   \*   \*   \*   \*   \*
> THE COURT: You don't have any objection?
> [DEFENSE]: I don't have any objection to the question. \* \* \* \* Other than my general objection to the fact that the witness—that the jurors are being able to ask questions. \* \* \* \* Without waiving that, I have no objections.
> THE COURT: Very well, That objection is overruled."
> II S.F. 197–199.

8. In *Buchanan,* supra, the majority of the Houston [14th] Court found: "The questions asked in this case were *not* especially *dangerous or helpful to either side." Id.,* at 646. The dissenter specifically identified the questions and paraphrased certain answers under the procedure which in his view "allowed the jurors to clear up any doubt they may have had," thereby lessening the State's burden to prove its case beyond a reasonable doubt and permitting jurors "to become advocates rather than impartial factfinders." *Id.,* at 647–648.

The *Allen* majority did not characterize questions submitted to only one witness for the State. *Id., passim.* The same dissenter in *Buchanan,* supra, noted that of several proposed questions to this witness, a police officer who observed the alleged offense, the court submitted the two that were ruled admissible. *Id.,* at 643. Without identifying questions and answers the dissenter condemned the procedure generally for substantially the same reasons developed in his *Buchanan* dissent. *Id.,* at 644.

There was only one question and answer in *Nichols,* supra; while some might regard the question as hostile to, or at least challenging the judgment of, the witness, the Houston [1st] Court believed the answer did not appear to be harmful. *Id.,* at 307.

In *Morrison* the scenario changed in that the question proffered by a juror was ruled out when the court sustained a hearsay objection by defendant. *Id.,* at 767; see *post.* The twist here is, thereafter, the prosecutor was allowed to recall the witness, over objection, and to ask him a question germane to the subject matter of the juror's question. *Id.,* at 767. For reasons delineated, the Waco Court found "the record demonstrates that the prosecution obtained an unfair advantage from the juror's question," the trial court abused its discretion and the error *per se* was harmful. *Id.,* at 769.

In *Velasquez,* supra, where the procedure apparently produced questions for several witnesses, the Corpus Christi Court summarized the questions to and answers from a specific witness about which defendant complained. *Id.,* at 845. Whether pertaining to all questions asked of all witnesses or only to the one complained about is not clear, but the Corpus Christi Court found the error, if any, was harmless, *viz:*

> "... The questions actually asked and complained about in the present case were not otherwise objected to as improper, and the answers were not prejudicial, inflammatory or *particularly relevant to the material issues involved.* In short, we find nothing in the question and answers to suggest that a rational trier of fact might have reached a different result if they had not been asked."

*Id.,* at 846.

The *Wilson* court pointed out that appellant even acknowledged one question was "inconsequential" and did not complain of the others that the prosecution "might have gained an unfair advantage." *Id.,* at 781–782.

In *Fazzino* "neither side was injured by any of the questions from the jurors." *Id.,* at 276.

This review is certainly not to pass on the merits of the issue in those causes, but simply to demonstrate that in none is there any "truth-finding" benefit accruing to the jury on account of an answer to a question from a juror. Whatever advantage the prosecution may gain from a juror's question—whether answered or not—is another question. See *Nichols,* supra, at 308.

9. After the jury left the courtroom, the visiting judge presented the question to counsel and apparently asked for objections, the following occurred:

> "[DEFENSE]: I don't have—
> [STATE]: I object—I object—I object to that, Your Honor
> THE COURT: You *object to it on what* basis?
> [STATE]: I don't have a basis, Sir. On the basis that I didn't ask that same question and I didn't want to ask her that.
> [DEFENSE]: I think it can be cleared up. I don't have any objection.
> THE COURT: What?

tions to the jury through abating proceedings after each witness has testified in order to ascertain whether jurors desire to submit questions and, if so, reducing them to writing, passing them to the judge through the bailiff, retiring the jury while the judge and counsel discuss their admissibility, bringing the jury back in and finally putting approved questions to the witness—once, twice, thrice and so on—devotes consumption of a considerable amount of trial time our rules regard as valuable to a gratuitously imposed exercise that, all things considered, has not yet been shown to be meritorious and worthy.[10]

> [DEFENSE]: I think it can be cleared up. I have no objection other than my general objection from the start about—to make sure I don't waive any objections.
> THE COURT: Does the State have an objection?
> [STATE]: I don't—I don't have a good legal objection, Sir. Not—
> THE COURT: What illegal objection do you have?
>
> * * * * * *
>
> [STATE]: Strategically that was a question I did not ask.
> THE COURT: Un-huh, Does Defense have any objection?
> [DEFENSE]: I've got no other objection other than my general objection about the witness—I mean, the jurors asking question generally, and I do not want to waive that objection.
> THE COURT: Well, my concern—you know, I don't know that I have a concern about questions being asked of other witnesses, but *this is the defendant,* and I feel a *little iffy about that. If you have an objection* to the jury asking the defendant a question, I may simply *pass on reading that.* Do you have *that* objection, do you?
> [DEFENSE]: I'll state *that* objection also, Your Honor. That I do have an objection to *them asking the defendant.*
> THE COURT: I'll sustain *that* objection."
> II S.F. 304–306.

**10.** In *Velasquez* the trial judge announced to the jury panel during *voir dire* that the court would accept written questions from them to be asked of witnesses, *id.,* at 845; in the other causes the judge instructed the empaneled jury just before the indictment was read, see, e.g., *Morrison,* at 767. *Quaere:* Will trial judges now be required to permit litigants to *voir dire* prospective jurors on matters related to questioning witnesses and, depending on their responses, to level challenges for cause and to exercise peremptory challenges in all cases, including capital murder?

In all seven causes the trial judge committed the court to receive such questions as jurors proffered in writing under terms and conditions prescribed at length, the pertinent essence of which in this cause is set out in the margin.[11] Compare *Buchanan,* at 645, *Allen* at 639–640, *Nichols,* at 307, *Morrison,* at 767 and *Velasquez,* at 845; *Wilson,* at 781; *Fazzino,* at 275. In this cause once the judge began to implement the "ritual," appellant initially objected "to the whole 'process' on the ground that it was not authorized by law, but his objection was overruled." *Morrison,* at 767.[12]

**11.** "And now, finally on this business of asking questions here is the way it will work. * * * * You can write out *one question or you can write ten questions. I don't care ...,* and *as many of you as want to ask questions are welcome to do so,* and I am not necessarily suggesting that any of you do. I am making the opportunity available to you. * * * * Let me caution you on two points. I want you to *feel free to ask any question you think is reasonable to ask,* and don't worry about whether it is admissible or not. I will make that decision for you. If you *think it is important in your mind to get the answer* to that question, *that's enough.* But, do try to keep in mind that the attorneys, who have prepared this case ... are going to presumably do a pretty decent job of asking all the questions that reasonably need to be asked of the witnesses. [But] the reason you have got this chance to ask questions is because *they may not have done as thorough a job as they think they have done,* or *you may simply be confused and want something clarified.* So be it. Second, keep in mind that I cannot inject myself into the questions they ask by reshaping their questions, and I can't do that for you either. [suggesting form of question]. *What you write* on your piece .of paper is what's going to be read. And if it *doesn't make any sense, too bad.* I am not going to fix it for you."

I S.F. 8–10; see Appendix 1.

**12.** More specifically, after the first witness the jury had no questions, but counsel anticipated the trial judge would continue to solicit questions, so the following occurred:

> "[DEFENSE]: Judge, for the record, we would like to object to the process of the Court allowing the jury to ask questions of each witness. On what grounds, I'm a little bit foggy, but all I know is, *it is not authorized by law,* and it—well, I'll just leave it at that.
> THE COURT: Does State have anything it wants to add?
> [STATE]: No, sir.
> THE COURT: Objection is overruled.

The salient facts surrounding the offense are summarized in the opinion below, at 766–767. The first three witnesses called by the State, two children of the victim and a passerby, recounted particular parts of the episode each respectively observed. Not until the fourth witness had testified did a juror present a question. A detective who investigated the crime scene testified that he found "several drops of blood" in a hallway of the victim's home, and a photograph of the blood was admitted in evidence. The juror asked, "Was any of the blood in the hall Steve Morrison's?" Because the trial sustained appellant's hearsay objection, the question was never asked. However, the State was permitted immediately to recall the detective and have him testify that he did not observe any "wounds, scratches or injuries" on appellant the night of the murder. See *Morrison*, supra, at 767; see also excerpt from I S.F. 127–132, attached as Appendix 2.

The dissent characterizes the juror's question as "neutral" and "not itself a partisan inquiry," to conclude that "any *disadvantage* actually suffered by appellant was not the result of any *institutional unfairness* [;] [a]ccordingly, the trial judge did not err to *receive it and make it known to the parties*." At 906. But, of course, that cannot be the end of this matter. That any correlative *advantage* actually gained by the prosecution was the direct result of the question raised by the juror cannot reasonably be disputed—especially since the State had no known evidence that would directly answer the question. See Appendix 2, I S.F. 128–129.[13] And of that appellant complained on appeal, and the court of appeals decided that was the harm engendered by the practice in this cause. *Morrison*, at 767, 769.

In this cause, as well as others like it, a trial judge cannot effectively determine the subjective purposeful intent of any juror given *carte blanche* "to ask any question you think is reasonable to ask," and is "important ... to get the answer." See note 11, *ante*. From circumstances then extant the judge may surmise as much, but relevancy rather than undisclosed motive in putting a question to a witness determines admissibility of the prospective answer, unless otherwise exceptional or excludable on special grounds. Tex.R.Crim.Evid.Rules 401–404. So here, whether the question is characterized as "neutral" or "nonpartisan," at 906, the inescapable conclusion is that after the trial judge ruled it out as inadmissible hearsay, the prosecution was able to capitalize on the unanswered ques-

[DEFENSE]: Could I have a running objection to that whole process for the rest of the trial, Judge?
THE COURT: Absolutely."
I S.F. 37.

13. The dissenting opinion at 905, n. 16, alludes to the only other question, one asking a psychiatrist to define "limited impulse control." Interestingly, the term was put to him during cross examination by counsel for appellant as one of two symptoms exhibited by a person with a schizotypal *personality* disorder, which was a diagnosis previously made of appellant. I S.F. 158–160, 165. (The other is being *paranoid* and *suspicious*.) Naturally, counsel made only "the objection we have got as a running objection." *Id.*, at 175. See note 12, *ante*.

The single answer that question consumes practically two pages in the statement of facts. *Id.*, at 175–176. My understanding of the thrust of his response differs from that of the dissent, however.

The good doctor laid down a hypothetical setting that "in terms of someone speaks to me rudely in AppleTree or whatever, I might have an impulse to choke them or something." But, he explains, "most people would be able to say well, no, that's inappropriate ... due to a lot of different factors ... that allow us that ability." For example, he says, "Very often with children or whatever, you will see the lack of impulse control or whatever, in terms of whatever impulse comes into their mind, they pretty much will do it." Parents "attempt to establish some internal controls ... so that they will react appropriately, socially appropriately, in certain situations." On the other hand, "[t]here are a number of *psychiatric* disorders that can even impair even more so on a person's ability to control their impulses." But, "the *personality* disorder diagnoses were actually developed to say that the person—yeah, they are *suspicious or impulsive or whatever*, but they did have the *basic abilities to control their behavior if they chose to*." "Most of us normally and also *personality disorders* are considered in the same light, that they would have the ability to control their impulses, despite a stressful situation. You know, it is stressful, but given the situation, most of us would not choke the person in Apple-Tree."

tion by recalling the detective to provide what the prosecution intended to be satisfactory answer for the juror—and no doubt those other jurors who discussed with the questioner during their deliberations.

Whatever the definition of "institutional unfairness" may encompass, it surely includes any unauthorized practice that invites a juror to initiate any inquiry about any point believed "reasonable" and "important" which the trial judge is committed to receive regardless of whether she deems it "neutral," "partisan" or just plain silly, and although it turns out to be inadmissible, the prosecutor is thus motivated and permitted to introduce testimony that is responsive to the juror's question but is patently unfavorable to defendant. To institutionalize that kind of practice is, in my judgment, unfair.

Ultimately though, my conclusion is that the whole exercise is obviously intended to exalt lay jurors in performing their civic duty by leading them to feel they can be more active participants in the judicial part of the criminal justice system—a sort of leveling charade, a bit of pseudo-egalitarianism. To put the matter more bluntly, juror questioning at best is judicial pandering at worst.

Appellant complained at trial that the unilaterally imposed ritual is "not authorized by law" in this jurisdiction, and he is absolutely correct.

It will not do to say "that which is not forbidden is generally allowed," dissenting opinion at 906. "The common law is followed in criminal ... matters where it has not been changed by the Code [of Criminal Procedure]." *State v. Anderson*, 119 Tex. 110, 26 S.W.2d 174, at 175 (1930); cf. *Bloss v. State*, 127 Tex.Cr.R. 216, 75 S.W.2d 694, at 696 (1934) (common law prevails when code fails to provide rule of procedure); *Rudder v. State*, 29 Tex.App. 262, 15 S.W. 717, at 718 (1890) (common law precludes discharge of jury in absence of defendant since no express statutory rule provides otherwise); Article 1.27, V.A.C.C.P. (rules of common law govern any particular state of case not provided for in code of criminal procedure). Courts do not advance the common law by resurrecting that which the common law has already put to rest.

Because the Court rejects an incipient fad that bodes ill for a neutral and passive jury, but well for reincarnation of an active inquisitorial jury, for those additional reasons I join the opinion and judgment of the Court.

## APPENDIX I

### AFTERNOON PROCEEDINGS— 4:05 P.M.

MONDAY, MARCH 26, 1990

THE COURT: Counsel, is there anything to bring up before I seat the jury?

MR. LOCKE: Not that I am aware of, Judge.

MS. HANNA: No, sir.

THE COURT: Let's bring them in.

(Jury enters the courtroom.)

THE COURT: Just go ahead and be seated, members of the jury. All right, seats, everyone else. All right, counsel. I will call for formal announcements of ready in number 18,913–272, entitled State of Texas versus Steven Morrison. What says the State?

MR. LOCKE: State's ready, Your Honor.

THE COURT: Defense?

MS. HANNA: We're ready, Judge.

THE COURT: Very well. Members of the jury, you have noticed that when you entered the courtroom, everyone was standing, and that is a courtesy that is extended to juries. I want you to feel free however to come straight in and have your seat, because you are the honored guests.

Now there are several instructions that I promised to you that I will get into now. I want to explain to you the order of trial that you are going to witness. The first item of business is these instructions. Following these instructions, from there. In order to get over that hurdle, we have to ask you to step into the jury room. We try to keep that to a minimum, but it happens in most cases, so don't be surprised if it

does in this case. Please be assured that no statement or ruling or remark that you might see me make during the course of this trial is intended as an expression of my opinion about how the case should be decided. That is your function and not mine.

Now a word about note taking. As I have told you, you are going to be permitted to take notes, and you are going to be permitted to take them to the jury room with you to use during deliberations. We will take them up at end of the day just for safekeeping and return them to you the next morning. Please remember not to discuss the notes that you take during the progress of the trial with anybody, including other jurors. You have been told not to discuss the case with anybody until it is submitted to you for decision. That includes your brother and sister jurors. You can only talk about the case among yourselves after it is submitted to you for decision. That includes quizzing each other about what you wrote down in the notes. Now the subject of note taking is a small controversy, you might say, in American law, and Texas is not immune from that. And, in order to make it legally proper, I believe it is important to give you the following particular instructions about it. Please do not feel that you must take notes or that the court necessarily encourages you to take notes. Please be assured that it is your individual option. Nobody has to. You can start or stop as you see fit. For those of you who do take notes, please consider these words of caution. Remember that your role here is to decide the credibility of the witnesses. So it is important for you to pay attention to not only what is said but sometimes how it is said. Therefore, I don't want you to try to be a verbatim stenographer of what is going on in the evidence. We have an audio taping apparatus that is rolling as I speak here, that will be going all during the trial, so if there is ever any question about what was said, we can get that played back for you. Just by way of a suggestion that may or may not apply in this case and is certainly not intended to be the exclusive use of your notes, you might want to write down

things that you think you may need help in remembering, such as names of witnesses, proper names of other persons that come up in the trial, dates, times, sequences, things like that. Please do not discard the notes that you do take, but keep them and, if possible, go ahead and keep them attached to that little pad. And if you would keep your name on the front of the pad, that will help us in distributing them to you after we take them up. At the end of the case, we are going to preserve all of the notes that you might have taken, so that anybody who is reviewing the record of this trial can decide whether the note taking was permissible or impermissible. I remind you that you are certainly welcome to use your notes during your deliberations, but it is very important for you to not try to overly influence some other juror who happened not to take notes with your recollection of the testimony reflected in your notes. In other words, just because you are a note taker does not mean that your recollection of the evidence, as reflected in your notes, is entitled to any greater weight than that of another juror who didn't take notes but just happens to remember it another way. Once again, if you disagree about what was shown in the evidence, then we can consult the tape to try to answer the question for you.

And now, finally, on this business of asking questions, here is the way that will work. After each witness that appears in the case has been questioned by the attorneys, I will turn to the jury and ask if any of you have questions. If you do, just signify to me by hand that you have one and I will give you a brief amount of time to finish writing out your question or questions on a slip of paper. You can write one question or you can write ten questions. I don't care. But they all have to be written, and as many of you as want to ask questions are welcome to do so, and I am not necessarily suggesting that any of you should. I am making the opportunity available to you. And those will be collected from you and you will be asked to go in the jury room for a short stay while I review those questions. And your questions are going to have to pass the same legal test of

admissibility that the attorneys' questions do. Nothing that they couldn't get into evidence will you be allowed to get into evidence by asking the question. And the responsibility for whether your question gets asked or not will be mine and mine alone. If your question does not get asked, you should not surmise that it is because one of the attorneys tried to keep it out. After I have had a chance to review your questions, I will bring you back in the courtroom and I will read your question to the witness on the stand and, after the witness responds, the attorneys will—can we keep the whispering at counsel table down for just a minute. It is getting to be a distraction. I will read the question to the witness. The witness will answer, and then the attorneys will be given a chance to ask follow-up questions on the same subject, but they can't go back and reopen some other subject. Both attorneys will be given a chance to ask those follow-up questions. And in order to bring some finality to it, I won't be able to allow you to ask your own follow-up questions of that witness. And you will have this opportunity to ask questions as each witness comes to the stand, by the way. Now, let me caution you on two points. I want you to feel free to ask any question you think is reasonable to ask, and don't worry about whether it is admissible or not. I will make that decision for you. If you think it is important in your mind to get the answer to that question, that's enough. But, do try to keep in mind that the attorneys, who have prepared this case and have thought about it and studied on it and know what the legal issues are, are going to presumably do a pretty decent job of asking all the questions that reasonably need to be asked of the witnesses. Having said that, let me back up again though and tell you that the reason you have got this chance to ask questions is because they may not have done as thorough a job as they think they have done, or you may simply be confused and want something clarified. So be it. Second, keep in mind that I cannot inject myself into the questions they ask by re-shaping their questions, and I can't do it

for you either. So, don't send up a question to me that says—ask the fellow about why couldn't he get his car fixed. Instead, if you want to know about that, you write out—Why couldn't you get your car fixed?—question mark. And I will read it that way verbatim. You understand me? What you write on your piece of paper is what's going to get read. And if it doesn't make any sense, too bad. I am not going to fix it for you.

All right. That concludes the instructions I had for you. I call on the State's attorney to read the indictment. I will ask the defendant to please stand.

## APPENDIX II

### AFTERNOON PROCEEDINGS—
1:43 P.M.

#### TUESDAY, MARCH 27, 1990

THE COURT: Are we ready for the jury back? Defense?

MS. HANNA: Yes, sir.

THE COURT: State

MR. LOCKE: Yes, Your Honor.

THE COURT: All right. Be seated, everyone. Does either side have any further questions of this witness?

MS. HANNA: No, Judge.

MR. LOCKE: No, Your Honor.

THE COURT: All right, members of the jury. State and Defense have finished their questions to this witness. Do any of you have any questions of him? There is a question. We will wait for the juror to finish it.

MR. LOCKE: If I may, I will offer State's Exhibit 14, which is this diagram.

MS. HANNA: We have no objections, Your Honor.

THE COURT: Fourteen is admitted.

(Brief pause.)

THE COURT: All right, members of the jury. Do I have all of the questions that any of you wish to submit? Would the jury please step in the jury room, please.

(Jury exits the courtroom.)

THE COURT: All right, Detective Fickey, would you kindly step out in the hallway in just a minute—for just a minute. Counsel, approach.

(Bench conference outside presence of jury.)

THE COURT: The question from one of the jurors reads as follows: "Was any of the blood in the hall Steve Morrison's?"

MR. BRYAN: We would object to that question on the grounds that he has no personal knowledge of—and is not a lab technician—doesn't have the qualifications to testify as to whose blood belongs to who, and calls for hearsay.

THE COURT: What says the State?

MR. LOCKE: He has already been allowed to testify from lab reports at Defense's request that he do so. You know, as a sponsoring witness for a lab report. If he has similar knowledge from similar source, I would think that would be opened by the line of defense questioning.

MR. BRYAN: Judge, the Defense merely asked about her blood. We didn't go into his blood.

THE COURT: What does the lab report that is in evidence cover?

MR. LOCKE: I think the—

THE COURT: Shirt only? Or her blood?

MR. LOCKE: Her blood only. The content of her blood only.

MR. BRYAN: There was no testing done on his blood. There was no blood taken from him, is that right?

MR. LOCKE: That's right.

MR. BRYAN: There is no way he can know. No way anyone could know.

MR. LOCKE: They would know it was consistent with hers, but that's all they would know. That it matches her blood type.

MR. BRYAN: Whatever sample they took matched. They didn't take every bit of blood on the floor.

MR. LOCKE: I guess that's possible. They may not have tested every spot.

MS. HANNA: I don't think they tested his blood at all.

MR. BRYAN: We further object on the same grounds the Court has given us a running objection to—Any question that a juror asks is not authorized by law.

MR. LOCKE: I might as well bring this up outside the presence. If he is still here for all purposes, if I may ask him a question, I intended and did not—forgot—to ask him his observations of Steve's physical well-being on the night he was arrested, when he saw him last. I don't think there is anything objectionable about that, but rather than letting them in and have you object and have them go back out, I thought I would bring it up.

THE COURT: Well, your position on the admissibility of this question is that the defense has somehow opened the door and waived any complaint that this question asked for a response based on hearsay or something other than personal knowledge.

MR. LOCKE: That's the area under which that I responded, yes.

THE COURT: I sustain the Defense's objection. If you are asking whether you can recall the witness to ask him another question, I am prepared to rule on that now before we bring the jury back in.

MR. LOCKE: Well, then I would ask to do so.

THE COURT: What says the Defense on that?

MR. BRYAN: Well, he's already been passed and closed and, in view of the procedure here, we allowed a juror to ask a question, that has obviously now stimulated another area that he needs to cover. That is one of the problems I see with getting into juror's questions. It's—there is no end to it. We would object on the grounds that he has already been passed. Under this unusual procedure of letting the jurors ask, I don't think the Court ought to allow either side to follow up with more questions after a juror asks a question, because it is going to be a tip off, possibly, as to which side objected, why the question wasn't asked, and it may be a comment on the weight of the evidence to allow one side

or the other to come in and follow a juror's question with another question.

THE COURT: All right. I'll permit you to recall the witness. Seat the jury. Your objection is overruled, Defense.

(End of bench conference. Jury enters courtroom.)

THE COURT: Seats, everyone. Members of the jury, the question that was propounded by the juror, I have excluded and will not be able to submit it to the witness. Go ahead, counsel, if there are other questions.

### RESUME FURTHER REDIRECT EXAMINATION

BY MR. LOCKE:

Q Detective Fickey, did you see Steven Morrison later on the same night, maybe the date after the fourth, past midnight, but the same night, prior to daylight?

A Yes, I did.

Q Did you observe any wounds, scratches or injuries to him of any sort? Just your personal observation?

A No, I did not.

THE COURT: Excuse me just a minute. Let's take just a couple of minutes here. You can go ahead and step into the jury room for your own privacy. We have a juror with an upset stomach, and she is going to take a little medication.

(Brief pause.)

THE COURT: All right. The jury is intact now. We will resume.

MR. LOCKE: That's all I have, Your Honor.

CAMPBELL, Judge, dissenting.

As I read the majority opinion, it contains two distinct arguments to support its conclusion that juror questioning in state criminal trials is always unlawful: (1) trial courts have no power to allow such questioning, and (2) in any event, such questioning must not be allowed because its "benefits ... fade to insignificance in light of the perils presented" to our traditional adver-

sary system. Because neither argument has an adequate foundation, I respectfully dissent.

The threshold question presented is whether our state trial courts have the *power* to allow juror questioning in the course of a criminal trial. The majority answers this question in the negative, explaining that it "know[s] of no authority establishing or authorizing jurors to ask questions of witnesses." In my view, the majority has misperceived the nature of the judicial power granted by our state constitution.

The Texas Constitution explicitly vests the judicial power of the state in the courts. Tex. Const. art. 5, § 1. The core of this constitutional grant of power, as we have previously recognized, includes the power (1) *to receive evidence;* (2) to decide the issues of fact raised by the pleadings; (3) to decide the relevant questions of law; (4) to enter a final judgment on the facts and the law; and (5) to execute the final judgment and sentence. *Armadillo Bail Bonds v. State,* 802 S.W.2d 237, 239 (Tex. Cr.App.1990); *Kelley v. State,* 676 S.W.2d 104, 107 (Tex.Cr.App.1984). Furthermore, necessarily included within the constitutional grant of judicial power are all powers reasonably proper and necessary for the effective exercise of the core judicial powers. *State v. Johnson,* 821 S.W.2d 609, 612–613 (Tex.Cr.App.1991); *Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398–399 (Tex.1979). Therefore, if a trial court reasonably concludes that juror questioning is necessary for the proper receipt of evidence and the discovery of the truth, it has the power to allow such questioning, at least in the absence of a valid statute or court-made rule to the contrary.

The issue of power aside, the majority also condemns juror questioning on the ground it

encourages jurors to depart from their role as passive listeners and assume an active adversarial or inquisitorial stance. Such participation inevitably leads the inquirer to draw conclusions or settle on a given legal theory before the parties have completed their presentations, and

before the court has instructed the jury on the law of the case.

The majority further opines that "the dangers inherent in such a practice cannot be adequately circumvented by the imposition of procedural safeguards." With all due respect, this is nothing but pseudo-psychological speculation unsupported by reason or evidence. Indeed, a recent empirical study conducted by the American Judicature Society found "no evidence to support the existence of any harmful consequences" of juror questioning, provided that a few simple procedural safeguards were implemented. See C. Michel, *Should Jurors Be Allowed to Pose Written Questions to Witnesses During a Trial?* 55 Tex.B.J. 1020, 1024 (1992).

Of the dozens of state and federal jurisdictions that have considered the issue so far, apparently only one (Georgia) prohibits juror questioning of any kind. See Comment, *Juror Questions: A Survey of Theory and Use,* 55 Mo.L.Rev. 817, 839–840 (1990). Every other jurisdiction has recognized that valid reasons exist for leaving juror questioning to the sound discretion of the trial court. See, e.g., *United States v. Witt,* 215 F.2d 580 (2d Cir.), cert. denied, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954); *United States v. Polowichak,* 783 F.2d 410 (4th Cir.1986); *United States v. Callahan,* 588 F.2d 1078 (5th Cir.), cert. denied, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); *United States v. Gonzales,* 424 F.2d 1055 (9th Cir.1970); *Nelson v. State,* 257 Ark. 1, 513 S.W.2d 496 (1974); *Cheeks v. State,* 266 Ind. 190, 361 N.E.2d 906 (1977). As the United States Court of Appeals for the Fifth Circuit explained in *Callahan:*

> There is nothing improper about the practice of allowing occasional questions from jurors to be asked of witnesses. If a juror is unclear as to a point in the proof, it makes good common sense to allow questions to be asked about it. If nothing else, the question should alert trial counsel that a particular factual issue may need more extensive develop-

ment. Trials exist to develop truth. It may sometimes be that counsel are so familiar with a case that they fail to see problems that would naturally bother a juror who is presented with the facts the first time.

588 F.2d at 1086. Moreover, it is important to realize that pertinent juror questions can be as helpful to the defense as to the State in a criminal trial.

In my view, trial courts should have the discretion to allow juror questioning provided they follow these safeguards to protect the adversary process:

First, the trial judge should notify counsel before trial that she intends to allow juror questions. Such pre-trial warnings would enable counsel to modify their trial strategies, if need be, to accommodate the innovation.

Second, the trial judge should inform the jurors before trial that, although their primary duty is to decide the facts from the evidence presented by counsel, they will have a limited right to ask questions. The trial judge should also explain the overall procedure involved.

Third, the court should allow the juror interrogation immediately after both counsel have examined a witness, while the jurors' questions are still fresh in their minds and the witness is still available.

Fourth, the juror questions should be kept relatively few in number but otherwise limited only by the Texas Rules of Criminal Evidence.

Fifth, the questions should be submitted in writing to the trial judge, who should prohibit, *sua sponte,* clearly improper questions.

Sixth, counsel should be able to object to any question, and get a ruling on the objection, outside the hearing of the jury.[1]

Seventh, when the judge rejects a juror's question, she should briefly but carefully explain the rejection to the jury. Such an explanation will help prevent speculation

---

1. "If questions [by the jury] are allowed, a requirement that they be submitted to the judge in writing will facilitate consideration in the absence of the jury and avoid prejudice to an objecting party." 1 J. Strong (ed.), *McCormick on Evidence* § 8, n. 4 (1992).

by the jury both as to the reasons for the rejection and the forbidden answer.

Eighth, if the judge accepts the question, she should ask it of the witness herself.

Ninth, after the jury interrogation, counsel should have the opportunity to re-examine the witness via the usual procedure for direct and cross-examination. The re-examination should be restricted to the scope of the subject matter of the jurors' questions.

I am satisfied that with these safeguards, there would be no substantial possibility of any harm to our traditional adversary system. If, as seems extremely unlikely, it was later determined that juror questioning was truly threatening our adversary system, it could be prohibited by rule.

Until there is a specific, valid legislative or constitutional prohibition against juror questioning, it would seem that appellate judges are ill-equipped to decide policy questions regarding this matter that impact upon the fair and efficient administration of justice in our trial courts. To the majority's decision to usurp this trial court function, I dissent.

McCORMICK, P.J., and WHITE, J., join.

BENAVIDES, Judge, dissenting.

Ours is an adversarial system.[1] Although it has serious drawbacks in some respects, as all systems do, it nevertheless assists the truth-finding process in ways no other system really can.[2] For example, when two or more parties are in contention, the impetus for investigating and presenting evidence which favors each is strongest with the party himself. This is precisely because each party is necessarily partial to his own position. If left alone in charge of finding evidence upon which the dispute might be resolved, he could reasonably be expected to discover and present all of the evidence supporting his own position and none of that supporting the position of his opponent. Consequently, when each party to the litigation is permitted equal latitude in this regard, it is reasonable to anticipate a more thorough catalog of the relevant evidence than would be assembled by a strictly impartial investigator. A core assurance of our adversary system is, therefore, that every party have control, concurrent with that of every other party, over the discovery and tender of evidence, the application of optional rules affecting its admissibility, and the argument of its significance to the factfinder.

Likewise, it is essential that the decisionmakers in an adversary system remain generally neutral and passive throughout all phases of litigation devoted to the production of evidence. Just as it would be antisystemic to deprive a party of loyally biased advocacy for his own position, so also would it contradict the basic principles of our jurisprudence to allow partisan advocacy by judges or jurors at any time before an ultimate issue has been given over to them for disposition. For this reason, trial judges should be especially sensitive about their own impartiality and that of the jurors. Decisionmakers, both as to law and fact, are to remain nonpartisan and uncommitted until the presentation of evidence and argument is concluded. Our jurispru-

---

1. For useful information on the historical development and underlying theory of adversary procedure in Anglo–American jurisprudence, see Stephan Landsman, *The Adversary System, A Description and Defense* (1984). *Also* Stephan Landsman, *The Rise of the Contentious Spirit: Adversary Procedure in Eighteenth Century England,* 75 Cornell L.Rev. 497 (1990); Gary Goodpaster, *On the Theory of American Adversary Criminal Trial,* 78 J.Crim.L. & Criminology 118 (1987).

2. It is widely accepted that the primary goal of adversary process is a fair resolution of disputes between litigants, not the discovery of objective historical fact. Much criticism of the system relies heavily upon this distinction and upon a modern preference for truth-finding as the main purpose in litigation. *E.g.,* Thomas L. Steffen, *Truth as Second Fiddle: Reevaluating the Place of Truth in the Adversarial Trial Ensemble,* 1988 Utah L.Rev. 799 (1988); Marvin Frankel, *Partisan Justice* (1980). I am disinclined to enter this debate in the present context, however, both because this Court is bound by history, precedent, and legislation to accept the system as it is and because I believe that the adversary process, whatever its most salient feature, is indeed committed to the discovery of truth in a specific and unique way.

dence thus divides the responsibility for investigating and deciding in such a way that advocates do not judge and judges do not advocate. The courts in such a system are not at liberty, at least absent legislation, to control or limit the production of evidence in such a way as to undermine these fundamental values.

Texas is fiercely adversarial. Certainly as regards the participation of trial judges in the examination of witnesses, our state is second to none in its disapproval of non-adversarial methods. For example, every other state which has enacted the Federal Rules of Evidence except Oregon has adopted some version of Rule 614 authorizing trial judges to both call and examine witnesses on their own volition.[3] Texas, in stark contrast, has rejected Rule 614 altogether, both in civil and in criminal litigation.

Nevertheless, this Court has often approved the practice of trial judges propounding questions to witnesses called by the parties, at least when it might fairly be said that the purpose of such questioning was to elicit information or to clarify issues, and not to advocate a partisan position.[4] If nothing else, such approval indicates our willingness to afford trial judges a measure of discretion in practice which has not been specifically afforded them by rule or statute.[5] Indeed, it is not inappropriate that legal systems sometimes be allowed to evolve in response to preferred methods of judges or practitioners.[6] It is

**3.** *See* Gregory P. Joseph & Stephen A. Saltzburg, *Evidence in America—The Federal Rules in the States* §§ 48.1—48.4 (1987).

Federal Rule 614 provides, in its entirety:

"**(a) Calling by court.** The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.

"**(b) Interrogation by court.** The court may interrogate witnesses, whether called by itself or by a party.

"**(c) Objections.** Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present."

**4.** *Brewer v. State*, 572 S.W.2d 719, 721 (Tex.Crim.App.1978); *Munoz v. State*, 485 S.W.2d 782, 784 (Tex.Crim.App.1972); *Navarro v. State*, 477 S.W.2d 291, 292 (Tex.Crim.App.1972); *Stewart v. State*, 438 S.W.2d 560, 561–562 (Tex.Crim.App.1969); *Ash v. State*, 420 S.W.2d 703, 705 (Tex.Crim.App.1967); *Marshall v. State*, 164 Tex.Crim.R. 167, 297 S.W.2d 135 (1957); *Milo v. State*, 152 Tex.Crim.R. 405, 214 S.W.2d 618, 619 (1948); *Rodrigues v. State*, 110 Tex.Crim. 267, 8 S.W.2d 149, 150 (1928). *Cf. Cleveland v. State*, 588 S.W.2d 942, 945 (Tex.Crim.App.1979); *Enriquez v. State*, 429 S.W.2d 141, 144 (Tex.Crim.App.1968).

Several courts of appeals have done much the same thing. *Ross v. State*, 800 S.W.2d 262, 268 (Tex.App.—Houston [14th Dist.] 1990) *PDR ref'd;* *Burks v. State*, 693 S.W.2d 747, 750 (Tex.App. [14th Dist.] 1985) *PDR ref'd; Silva v. State*, 635 S.W.2d 775, 778 (Tex.App.—Corpus Christi 1982) *PDR ref'd; Bautista v. State*, 632 S.W.2d 846, 850–851 (Tex.App.—Houston [14th Dist.] 1982) *PDR ref'd; Richardson v. State*, 632 S.W.2d 700, 702–703 (Tex.App.—Fort Worth 1982); *Voelkel v. State*, 629 S.W.2d 243, 246 (Tex.App.—Fort Worth 1982), *aff'd*, 717 S.W.2d 314. *Cf. Betancourt v. State*, 657 S.W.2d 451, 455–456 (Tex.App.—Corpus Christi 1983).

**5.** The Court is wrong to suggest that I favor juror questioning "because judicial questioning of witnesses has been tolerated." At 886, n. 10. Indeed, I am inclined to be suspicious of both practices for reasons which must be abundantly clear to any impartial reader of this opinion. But judicial questioning is itself an antiadversarial practice, and its widespread acceptance therefore refutes the argument that everything antiadversarial must for that reason be condemned. Certainly, the cases I cite in this connection do not "represent wholesale and unquestioned approval of judicial questioning." But neither can it fairly be said that I support the wholesale and unquestioned approval of juror questioning. My point is only that both judges and jurors are required by the adversary system to remain impartial and uncommitted, *that the questioning of witnesses by either judge or jury threatens that impartiality*, and that such questioning should therefore be permitted only in a limited and nonadversarial manner.

**6.** What is now a general rule tolerating limited participation by trial judges in the examination of witnesses appears in earlier cases as a version of the ubiquitous harmless error doctrine. Thus, in *Harrell v. State*, 39 Tex.Crim.R. 204, 45 S.W. 581, 586–587 (1898), this Court condemned the practice at great length, concluding with the following observations:

We cannot commend the action of the judge in his attempt to interfere with the province of counsel for the state in the examination of witnesses, and, if it appeared to us that such interference on his part was calculated to prejudice the rights of the appellant, we would not hesitate to reverse this case. Such interference on the part of a judge can never be called for, and especially in this case, where both the state and the defendant were represented by able counsel, it was absolutely unwarranted.

simply no longer realistic to insist upon a rigorously adversarial discipline in the face of nonadversarial methods long accepted in practice and by now an established part of our authoritative decisional law.

Many of our sister states have condoned, often with some trepidation, the questioning of witnesses by jurors.[7] All federal circuits to have considered the matter have also tolerated it, although it has been commended by none but the Fifth.[8] Others usually find the practice disturbing but discretionary with the trial judge.[9] Clearly, methods allowing jurors to ask questions are gaining momentum in the trial courts.[10] The trial courts of Texas are now experimenting with such methods to the extent that it now commands our attention. I am aware of four opinions from intermediate appellate courts in Texas addressing the issue.[11] Consistent with the treatment of the question by other jurisdictions, one of these finds no error in the practice, two approve it over urgent dissent, and one accepts it only with serious reservations.

I acknowledge that the remarkable practice of permitting participation by jurors in the production of evidence at trial impugns adversary procedure because it diminishes juror passivity and interferes with the usual assignment of responsibility for nonproduction of evidence, two of the essential features distinguishing our system from inquisitorial models. But when such participation is conscientiously subjected to the kind of judicial control which effectively prevents advocacy or premature commitment by the jurors, I do not believe that the fundamental values of our adversary system are significantly compromised. Accordingly, I cannot vote categorically to prohibit evolution of the system in this way.

The adversary process, as any institutional process, has some undesirable side effects. However we may relish a contest between talented advocates because we think the outcome of trial to depend more on their respective skills than on the relative merits of their positions, we do not pretend that the official goal of such a

---

But, by lineal descent, these comments were somehow compressed into the following rule: [W]hen the Court participates in the questioning of witnesses seeking information only, no error is committed.
*Ash v. State,* 420 S.W.2d 703, 705 (1967).

**7.** *E.g., Spitzer v. Harris & Co.,* 217 Conn. 532, 587 A.2d 105, 111–114 (1991); *State v. Johnson,* 784 P.2d 1135, 1145 (Utah 1989); *State v. Rodriguez,* 107 N.M. 611, 762 P.2d 898, 901–902 (Ct. App.1988); *People v. McAlister,* 167 Cal.App.3d 633, 644–646, 213 Cal.Rptr. 271, 276–278 (1985); *State v. LeMaster,* 137 Ariz. 159, 669 P.2d 592, 596–598 (Ct.App.1983); *State v. Barrett,* 278 S.C. 414, 297 S.E.2d 794, 795–796 (1982); *Story v. State,* 157 Ga.App. 490, 278 S.E.2d 97 (1981). *Contra State v. Zima,* 237 Neb. 952, 468 N.W.2d 377 (1991). *See generally* Jonathan M. Purver, *Propriety of Jurors Asking Questions in Open Court During Course of Trial,* Anno., 31 A.L.R.3d 872.

**8.** *See generally* Robin C. Larner, *Jurors Questioning Witnesses in Federal Court,* Anno., 80 A.L.R.Fed. 892. *United States v. Callahan,* 588 F.2d 1078, 1086 (5th Cir.1979).

**9.** *E.g., United States v. Johnson,* 914 F.2d 136 (8th Cir.1990); *United States v. Nivica,* 887 F.2d 1110, 1123 (1st Cir.1989); *United States v. Land,* 877 F.2d 17, 19 (8th Cir.1989); *DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d 512, 515–

517 (4th Cir.1985); *United States v. Witt,* 215 F.2d 580, 584 (2nd Cir.1954).

**10.** It has been the supposition of its proponents that an organized approach to the interrogation of witnesses by jurors will facilitate resolution of factual disputes by clarifying the testimony, identifying issues requiring further development, and increasing juror attention to the evidence. Recent studies, however, have not supported this hypothesis. Neither, on the other hand, have they borne out fears of its opponents that the practice will lead jurors who question witnesses to abandon their neutrality prematurely. *Toward More Active Juries: Taking Notes and Asking Questions* (American Judicature Society 1991); Heur and Penrod, *Increasing Jurors' Participation in Trials: A Field Experiment with Jury Notetaking and Question Asking,* 12 L. & Human Behavior 231 (1988). *See also Allowing Jurors to Submit Questions to Witnesses,* 73 Ill.B.J. 155 (Nov.1984). Future studies may reveal the relative advantages and disadvantages of this practice more clearly. Sargeant, *Juror Questions During Trial? The Verdict Isn't In,* 25 Trial 14 (Sept.1989).

**11.** *Morrison,* 815 S.W.2d 766; *Velasquez v. State,* 815 S.W.2d 842 (Tex.App.—Corpus Christi 1991); *Buchanan v. State,* 807 S.W.2d 644 (Tex.App.—Houston [14th Dist.] 1991), *PDR granted; Allen v. State,* 807 S.W.2d 639 (Tex.App.—Houston [14th Dist.] 1991), *PDR granted.*

contest is really to identify the better lawyer. And, while we accept the occasional incompetence or inadvertence of attorneys which might sometimes produce avoidable losses for litigants, both public and private, we do not think that the system is working well when this happens.[12] Rather, in spite of its shortcomings, including many produced by the adversary process itself, we still believe our methods of adjudication to be intended mainly, although not exclusively, for the discovery of truth.[13] For this reason, trial judges should be allowed to implement truth-finding measures not forbidden by law so long as they do not thereby compromise fundamental standards of the adversary system.

I believe that the submission of questions from the jury is a permissible truth-finding method whenever it is scrupulously subjected to normal adversarial examination and is conducted in such a way that jurors do not become advocates for either side.[14] This means, of course, that jurors should not be permitted to investigate outside the courtroom or participate in a courtroom investigation which excludes either party or his lawful representative, except as otherwise provided by law.[15] Questions

propounded by jurors to witnesses should first be made subject to objection from all parties outside the jury's presence. Perhaps of greatest importance, jurors should not be permitted to question at such length or in such manner as to indicate a premature commitment in the case. And it goes without saying, of course, that the practice of jury questioning should never be conducted in such a way as to violate the positive law.

In the instant cause, one of the jurors wanted a witness to be asked whether any of Appellant's blood had been discovered at the scene.[16] Because the question would have called for hearsay, Appellant's objection to it was sustained. But the State later recalled the same witness and was permitted over a further objection to elicit from him that Appellant did not appear to be injured at the time of his arrest, shortly after the incident. From my reading of the record, it appears that this testimony was relevant, if at all, only to Appellant's unperfected claim of self-defense or to the kindred issue of sudden passion arising from adequate cause, which was actually raised by other evidence in the case.[17]

---

**12.** See Gerber, *Victory v. Truth: The Adversary System and Its Ethics,* 19 Ariz. State L.J. 3 (1987); Stephan Landsman, *The Decline of the Adversary System and the Changing Role of the Advocate in that System,* 18 San Diego L.Rev. 251 (1981); Frankel, *supra.*

**13.** Plainly the law of evidence, developed first by decisions of the courts and later by formal codification, is replete with rules of privilege and exclusion which effectively subjugate truth to ideals of fair play and public policy.

**14.** See Sylvester, Comment, *Your Honor, May I Ask a Question? The Inherent Dangers of Allowing Jurors to Question Witnesses,* 7 Cooley L.Rev. 213 (1990); Wulser, Comment, *Should Jurors Be Allowed to Ask Witnesses Questions in Criminal Trials?,* 58 UMKC L.Rev. 445 (1990); McLaughlin, Note, *Questions to Witnesses and Notetaking by the Jury as Aids in Understanding Complex Litigation,* 18 New Eng.L.Rev. 687 (1982); Harms, Comment, *The Questioning of Witnesses by Jurors,* 27 Am.U.L.Rev. 127 (1977).

**15.** The Court of Appeals in this case likened the practice of witness interrogation by jurors to a communication between jurors and attorneys, something which is ordinarily not permitted in our system and which jurors are admonished not to do in advance of trial. Of course, I do

not consider the practice at issue here to be at all like *ex parte* conversations between jurors and lawyers outside the courtroom, which is the specific impropriety to which such admonishment is mainly addressed. Rather I interpret the lower court's characterization of the present issue in this way as a recognition that our adversary system generally disapproves of advocates receiving assistance from decisionmakers in the presentation of their partisan positions. Confining juror questions to a formal courtroom environment tends to avoid the appearance of jurors actively helping the advocates.

**16.** The only other question from a juror asked the court's psychiatric expert to define the phrase "limited impulse control." His answer tended to suggest that Appellant was suffering a personality disorder which might have contributed to his losing control in circumstances such as those under which the murder was committed in this case. Neither party nor the Court of Appeals discussed this question and answer in treating the issue presented here.

**17.** Appellant's request that an issue of self-defense be submitted for jury consideration was denied by the trial judge. The court did, however, make Appellant's conviction for murder con-

Appellant insists that the practice of jurors questioning witnesses is only a thinly disguised means of communication between jurors and lawyers which should be prohibited both to deter jurors from becoming advocates and to prevent lawyers from gaining potentially advantageous tactical information about juror thought processes. The State, on the other hand, argues that the trial judge did not commit an abuse of discretion in this case because his supervision of juror questioning observed all of the safeguards thought to be necessary by other jurisdictions, because the practice is not inherently unfair to either party, and because an otherwise impartial request for information does not impugn juror neutrality just because it inspires one of the advocates to produce further evidence.

As applied to the instant case, I believe that the State has the better of this argument. I do not believe that receipt from the jury of a neutral question, which might produce an answer advantageous to either side, such as the one propounded here, at all impugns legitimate aims of the adversary process or compromises the impartiality of jurors. Nor, in my judgment, does it produce a significant danger that jurors will be prematurely committed to a certain view of the case in a way which orthodox adversary procedure is designed to avoid. I am not unmindful that the burden of proof always operates to disadvantage the party who bears it and that, because an issue of sudden passion arising from adequate cause was actually submitted for jury consideration in this case, it was the State's burden to disprove it beyond reasonable doubt. Certainly the question with which we are here concerned was meant to supply evidence pertinent to that issue. Had it not been asked at all, the State might thus have suffered the incremental disadvantage assigned by the burden of proof whenever there is an absence or deficiency of relevant evidence on an ultimate issue.

But the burden of proof is not a device for institutionalizing oversight or incom-petence. Just as we have allowed the neutral intervention of trial judges in witness interrogation even when it incidentally affects the adversary contest, I am now persuaded that a similar indulgence for jury questioning is also indicated. Because the question in this case was not itself a partisan inquiry, any disadvantage actually suffered by Appellant was not the result of an institutional unfairness. Accordingly, I would hold that the trial judge did not err to receive it or make it known to the parties.

In the instant cause, Appellant complained only that the practice at his trial violated basic principles of adversary litigation and jury impartiality. He nowhere suggested that the procedure ran afoul of any specific law, rule, or settled practice. This is, of course, something of a logistical problem for the Court, forcing it to hold that the practice amounts to reversible error, not because the law forbids it, but because there "is no authority establishing or authorizing jurors to ask questions of witnesses in the criminal jurisprudence of this state[.]" at 889. But, in our system of jurisprudence, that which is not forbidden is generally allowed. Although the Court here advances appropriate concerns about the desirability of juror questioning, it omits to identify in what respect the law was offended by the procedure. Specifically, it identifies no statutory or constitutional violation, and makes only a weak case of fundamental incompatibility with the adversary system as a whole. Instead, it seems merely to reject on policy grounds an increasingly well-received tool of litigation which has been categorically forbidden by only one other jurisdiction in the country.

I do not, of course, mean to suggest that the myriad evidentiary and procedural rules so characteristic of the adversary process may be at all compromised in the interest of truth-finding. I differ from the Court only inasmuch as I would hold that a procedure which violates none of those rules should not be forbidden unless it af-

---

ditional upon the jury's finding that he did not act "under the immediate influence of sudden passion arising from an adequate cause."

V.T.C.A., Penal Code § 19.04. *See Cobarrubio v. State,* 675 S.W.2d 749 (Tex.Crim.App.1983).

firmatively undermines core values of the adversary system. Because I am satisfied that the procedure employed in this cause did not, I respectfully dissent.

McCORMICK, P.J., joins.