101 So.2d 797 (1958)
Jack FERRARA, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
March 26, 1958.
Rehearing Denied April 28, 1958.
Frank Ragano and Mark R. Hawes, Tampa, for appellant.
Richard W. Ervin, Atty. Gen., and David U. Tumin, Asst. Atty. Gen., for appellee.
THOMAS, Justice.
When appellant was adjudged guilty of participation in a lottery by selling chances in a lottery to various persons, and was sentenced to serve a term in the penitentiary, this appeal from the judgment and sentence was taken.
At the beginning of the trial the question of the validity of a search of the appellant arose and the judge upon suggestion of the county solicitor conducted an inquiry in the absence of the jury to determine just what had transpired when the appellant was halted by the officers and the lottery tickets were taken from him.
During the examination of one of the policemen it developed that the appellant was being followed because the officers had information from a "confidential source" that he was engaged in the lottery business. The police had been told by the informer that he purchased lottery tickets *798 from the appellant every Saturday morning. Acting on this intelligence the police had watched the appellant's house every Saturday morning for three weeks prior to the arrest and had noted the course he took about the same hour each day when he left in his green Buick automobile en route to what is known in "Cuba" circles as the "check-up house."
On the day of the arrest, as the officers were following the appellant, he passed a red light and they stopped him and asked to examine his driver's license. They reminded the appellant that he had gone through the red light and told him they had reason to believe he was carrying "Cuba" tickets whereupon he secured a roll of the tickets from his pocket and threw it into the street. One of the officers retrieved the tickets and approximately $1,000 was taken from appellant's person.
When the jury returned to the courtroom the testimony was, in substance, repeated except that the court faithfully undertook to prevent any reference to events occurring prior to the actual pursuit and arrest. When the jury returned to the courtroom and the examination of the officer who had testified before the judge was resumed the witness said, while describing the arrest, that the appellant when asked for his driver's license was told that the witness "had reason to believe that he [appellant] was transporting bolita and possession of bolita at this time." Before the jury was recalled the attorney for appellant tried repeatedly to elicit the name of the person from whom the officer had obtained information about appellant's activities in the conduct of lotteries. Afterward he continued his efforts although he knew from his experience in the inquiry before, he would not be successful.
Nevertheless in his persistent attempts he injected the matter into the case and now poses the question whether or not error was committed when the officer was permitted to make the statement we have just quoted, and he leans heavily on the decision of this court in Collins v. State, Fla., 65 So.2d 61, 66, for support of his position. It is true that in the cited case we held that testimony of a witness that he had information from "some one or other" about the defendant's violation of the lottery laws was inadmissible because it was hearsay and, besides, afforded no opportunity for cross-examination. In that case the testimony was admitted as material "`to justify a basis for search and seizure'" without a warrant. We held, too, that there was no valid search incident to a lawful arrest inasmuch as the defendant was not shown to have committed any act which warranted the officers stopping him on the highway.
No question now before us involves a search warrant, but we are concerned only with the authority of the officers to search once the appellant was halted. He was quite properly stopped because he had violated the law by driving through a traffic light that was red. During the conversation with the officers he had exposed and discarded a roll of paper which they had secured and found to be lottery tickets. Then and there, in our opinion, the tickets became admissible evidence. State v. Simmons, Fla., 85 So.2d 879.
It appears that the procedure which the appellant now considers to have been damaging to his defense was created by the efforts to secure the name of an informer from whom the officer, presumably, got the impression that appellant was engaged in lottery operations. We stress the facts that no investigation was being held to determine whether or not the officers had information that would have been sufficient to obtain a search warrant had they had the time to apply for one, as was the case in Collins v. State, supra, and that, except for the deductions from appellant's own strategy, the jurors heard only that the officer told appellant he had reason to believe appellant was engaged in transportation or possession connected with lotteries. This "reason to believe" *799 might easily have come from sources other than an informer.
We conclude that in these circumstances we should not accept the argument that the judgment should be reversed because lurking in the background was some informer whom the appellant should have been permitted to examine.
Before passing to the next point we relate that appellant though sentenced on one count of the information was found guilty on four counts in one of which he was specifically charged with possession of lottery tickets.
Appellant's remaining point constitutes a challenge of the use and distribution of a pamphlet titled "Handbook for Trial Jurors serving in all Courts of Record in Hillsborough County, Florida," which bears the printed endorsement of all the then Circuit Judges of the Thirteenth Judicial Circuit, the Judge of the Criminal Court of Record, by whom the present case was tried, and the County Judge, and contains a statement of these judges urging jurors to read the booklet with great care in order that they may be aided in performing their important duty. The handbooks are sent to the jurors with the summonses and on each the juror is admonished to surrender the booklet upon reporting for service and not to take it into the jury room.
In the preface appears an eloquent statement of the responsibilities of a juror followed by "A Juror's Creed." In the creed the juror is described as a seeker of truth who must listen carefully to the evidence, heed the charges of the court, follow the arguments of counsel, eschew prejudice, be governed by intelligence rather than emotions, respect the opinions of fellow jurors, attempt by tolerance and understanding to bring about agreement, consent to no verdict which violates charges of the court or finds a fact known to be false, remember that though he is a juror today, tomorrow his rights may be tested by other jurors, and be so conscious of the duty to do justice that at the end of his service, his conscience will be clear and his citizenship unsullied.
Following the creed are listed the qualifications prerequisite to jury service as they are detailed in the statutes.
Next come the descriptions of civil and criminal cases and some of the distinctions between them.
Under the heading "Choosing a Trial Jury" the method of impanelling a jury to try a particular case is explained and reasons for excusing jurors, because of relationship between them and lawyers or litigants, knowledge of the case or fixed opinions, are set out. This subject is concluded with the statement that challenges by attorneys do not constitute a reflection on the juror's intelligence or integrity but only indicate that in the instant case it seems fair to dispense with his services.
Then the juror is enjoined to be punctual, to be attentive, to consider only the testimony offered at the trial, to refrain from investigations on his own account, to control his emotions, and to avoid displaying by facial expression or other means the impression he receives from any evidence, or incident of the trial.
The juror is admonished to ask no questions of the witnesses. We will presently revert to this matter.
The "Course of a Trial" is next detailed: Testimony of the witnesses for the plaintiff is received; witnesses for a party are examined by the attorney for that party and cross-examined by the lawyer for the opposing party, all in a search for the truth; when the taking of testimony is concluded the attorney for the plaintiff ordinarily addresses the jury first, followed by the lawyer for the defendant, and he in turn by the lawyer for the plaintiff who speaks in rebuttal; both undertake to assist the jury in analyzing the evidence, but each also attempts to convince the jury that his client should win. If the defendant in a criminal case offers no *800 testimony but his own, his attorney has the concluding address to the jury.
The jurors are told in the booklet that the judge guides the trial, rules on all questions of law, decides what questions asked witnesses are proper and what ones improper. At the conclusion of the trial, so they are advised, the power and responsibility shift from the judge to the jury and the jurors determine the questions of fact in the light of the judge's charges.
We reach the part of the handbook devoted to the conduct of the jurors when they are sent to their room. The juror is cautioned not to become at once opinionated lest he from pride refuse to recede even if shown to be in error. He is told that his verdict should "speak the truth" and that no element of chance such as determination of a point by lot or flip of a coin should ever corrupt the verdict.
In the next section the juror is apprised of the conduct expected of him when he is without the jury room: he should demean himself so there could be no cause to suspect his uprightness; he should reject gifts and favors, and avoid familiarity with anyone interested in the case.
The juror is advised that forms of appropriate verdicts will be furnished, that verdicts must be unanimous and need be signed only by the foreman of the jury. The procedure for handling a verdict once it is reached, is detailed, and sealed verdicts defined.
Publicity of proceedings before the jury retire is contrasted with secrecy which should clothe the actions of the jury after retirement, to insure free expression as testimony of individual witnesses is examined and opinions of jurors advanced.
In a concluding paragraph the juror is urged to be temperate in his discussions so that personal animosities among members of the jury may be avoided. It is remarked that in the heat of an argument, unrestrained, it would not be impossible for one juror to charge another with adopting a view because of corrupt motive and, if the information should be taken outside the jury room by a tale-bearer, fasten upon the accused juror a stigma for which he would have no redress. On the other hand, the juror is enjoined to report to the judge a well-founded belief that corruption has entered the jury room.
Finally, the sacrifice in time and money resulting from jury service is recognized but weighed against the duty and privilege of such service. And the means of obtaining excuses for the service are explained.
The booklet is capped by stressing the importance of jury service, and the obligation of each citizen drawn for such service thus to make a contribution to the effective administration of justice. So much for the pamphlet.
Persons possessing the qualifications to serve as jurors are not ignoramuses. They must be "law abiding citizens of approved integrity, good character, sound judgment and intelligence * * * who are not * * * mentally infirm * * *." Sec. 40.01(3), Florida Statutes 1955, and F.S.A.
We have perused the booklet, keeping in mind the qualifications of jurors, to see if anything it contained could possibly amount to a premature charge on any question that would cause a prospective juror to adopt an attitude that would interfere with the proper performance of his duties as a juror in the event he was called to serve on a petit jury. And we have found nothing in its contents that would bring such a result.
The booklet is pregnant with sound, sensible, advice, to persons needing it and capable of digesting it to the end that they will be more impressed by the importance of their part in the administration of justice, and understand more thoroughly the nature of their contribution.
*801 Jury service is sporadic and often long periods elaspe between summonses. The booklets are bound to enlighten those who are novices, to refresh the recollections of those who have had the experience. The advice is couched in such general language as to cause a litigant no harm at all, yet in such simple words as to dispel any idea the juror might entertain that there is mystery in the procedure in courts of justice which is incomprehensible to one not a votary of the law.
In sum, the jurors are told that they are searchers for truth and advised how best to find it. Cf. United States v. Gordon, 7 Cir., on rehearing, opinion filed February 19, 1958, 253 F.2d 177.
The appellant insists that the circulation of the booklet offends the statute, Sec. 918.10, Florida Statutes 1955, and F.S.A., specifying the manner of charging the jury. We reject the argument because we have found in the pamphlet no statements that could be dignified as charges on questions of law.
Reverting to the warning that jurors should not interrogate witnesses, we come to our only criticism of the contents of the booklet. We think that upon appropriate occasion a trier of fact might be completely justified in propounding a question.
There is authority supporting the position that such procedure should be discouraged but we find that the weight of opinion is to the contrary. We conclude that the procedure should be one to be controlled by the discretion of the trial judge. See note 159 A.L.R. 347. Cf. United States v. Witt, 2 Cir., 215 F.2d 580. In the present case, however, no harmful error occurred because of this provision in the booklet.
Affirmed.
TERRELL, C.J., and ROBERTS, THORNAL and O'CONNELL, JJ., concur.