PADOVANO, J.
In this criminal appeal, the defendant contends that the trial judge erred in excusing a juror and replacing her with an alternate. The trial judge permitted the jurors to submit questions to be asked of the witnesses but removed the juror in controversy on the ground that her questions violated the court’s instructions. This, we conclude, was an abuse of discretion. Although the juror asked many questions, there was nothing in her questions to suggest that she intended to disobey the trial court’s instructions or that she was otherwise unable to serve as a fair and impartial juror. Because the error in removing the juror was not harmless, we reverse the defendant’s convictions and remand the case for a new trial.
The defendant, Eric Washington, went into the Tallahassee State Bank on December 23, 2003, to exchange some coins for paper currency. Bank officials suspected that the coins were counterfeit or that they might have been stolen, and the ensuing confrontation led to the defendant’s arrest. The state did not charge the defendant with any offense relating to the coins, but the incident at the bank resulted in other criminal charges. The state filed a three-count information accusing the defendant of resisting arrest with violence, possession of cocaine and possession of marijuana.
At the beginning of trial, the judge informed the jurors that they would be permitted to ask questions of witnesses after the attorneys had completed their examination. The judge told the jurors that they could write questions on a piece of paper but that they should not include their names or juror numbers. The pertinent part of the judge’s instruction is as follows:
Because questioning witnesses is the primary responsibility of the attorneys, you are not encouraged to ask large numbers of questions. Keep in mind that the attorneys know the case better than you or I and each of them will be attempting to place before you all the evidence needed to assist you in reaching a proper verdict.
If you do opt to ask any questions, keep in mind that the questions must be directed to the witness and not to the attorneys or to myself. The purpose of the question should be to clarify the *1167 evidence, not to explore theories of your own, nor to discredit a witness.
The first witness, Nicole Hill, a teller, testified that the defendant told her the coins were twenty-dollar gold coins. Ms. Hill passed the coins to her supervisor, Ms. Glenn Parramore, who then summoned the security officer, Leon County Deputy Sheriff Toby Bruce. Deputy Bruce took the defendant to an empty office, and a short time later Ms. Hill saw the defendant running out of the office with Deputy Bruce and another officer in pursuit. The other officer grabbed the defendant’s jacket, but the jacket came off, and the defendant continued running. The three men ran out of Ms. Hill’s line of sight, but she could hear the defendant yelling in a scared voice, “Please help me, I didn’t know they were stolen, I’m hungry, I just wanted food.”
When the attorneys finished questioning Ms. Hill, the trial judge asked if jurors wanted to write down any questions, adding, “Don’t make any comment on the facts.... Simply a question, if you need some clarification.... You will get the ‘what happened next’ from the other witnesses. So this would just be to clarify what this witness said.” Outside the jury’s hearing, the judge indicated that he had been given a question: “What happened to the video camera and the drugs?” The judge said he presumed Ms. Hill could not answer, so he declined to ask.
Ms. Glenn Parramore, the assistant vice president of the bank, gave an account similar to the one given by Nicole Hill. Ms. Parramore was questioned in more detail about the bank cameras. She testified that there were thirteen cameras positioned in the bank. She added, however, that the cameras rotate and that they would not necessarily cover every part of the bank lobby at every moment.
When the lawyers had finished questioning Ms. Parramore, the trial judge received the following questions from a juror: “Where are the cameras from that day? Where did he get the coins from? Were the coins stolen? Why didn’t they ask him to leave?” After consulting with counsel, the trial judge asked only the first question, whether the bank still had the videotape from that day. Ms. Parramore said they did not, because they record over their videotapes every six weeks. The videotape for that day was recorded over, because the bank was not considered a victim in this case and the bank officers did not realize they needed to keep it.
After Ms. Parramore was excused, the trial judge instructed the jurors once again on the procedure he wanted them to follow in asking questions:
All I want is a question. And remember the question needs to be just to clarify this witness’ testimony. Don’t send us questions about something this witness doesn’t know anything about as to what some other witness might know. If you need clarification of the subject matter of this witness’ testimony, feel free to ask. But, obviously, for instance, her testimony was she didn’t talk to the defendant, don’t ask questions about what he said. I mean, those kind of things, it would have to be by some other witness. It just eats up time if we are asking questions that aren’t to clarify this witness’ testimony.
Deputy Toby Bruce testified that the defendant told him he found the coins on a shelf in an apartment. According to Deputy Bruce, the defendant was nervous, jittery and hyper. Deputy Bruce called Sergeant Steve Harrelson, who was more familiar with coins. He also called the dispatch operator to get more information about the coins and to run a routine check on the defendant. As Sergeant Harrelson *1168 was arriving, the dispatch operator told Deputy Bruce that there was an outstanding arrest warrant for the defendant for failure to pay child support. At that point, the defendant jumped up and ran from the office.
The officers chased the defendant through the lobby of the bank. Sergeant Harrelson grabbed the defendant by his jacket, the jacket came off, and the defendant continued to run. The officers managed to subdue the defendant, but by that time he was down a hallway of the bank, beyond the view of those who were in the lobby. Deputy Bruce testified that he and Sergeant Harrelson had their hands on the defendant and they all went down to the floor. The defendant then began “flailing his arms and legs, kicking his legs about,” and Deputy Bruce was kicked several times. Deputy Rick Parraro, who had arrived at the scene by then, handcuffed the defendant. The officers found cocaine in the defendant’s jacket and later found marijuana on his person when he was booked into the jail.
When the attorneys finished questioning Deputy Bruce, the trial judge informed them that he had received the following juror questions: “Did Mr. Washington take his jacket off or did it come off during the struggle? Please show on the diagram where the jacket came off. At what point was Mr. Washington placed under arrest? On what charges? Why didn’t the officer allow Mr. Washington to explain or acknowledgment of the warranty [sic]. What was the officer’s reason for placing handcuffs on Mr. Washington? Was Mr. Washington told he was under arrest? If so, why?” The trial judge reviewed these questions with the lawyers and then asked Deputy Bruce when the defendant was placed under arrest, the charges against him, when and why he was handcuffed, and when the jacket came off. The judge said he was paraphrasing some of the questions, because they were “convoluted,” and that he was allowing questions on matters the witnesses had already covered, so long as there was no objection.
Sergeant Harrelson testified that he went into the office where Deputy Bruce and the defendant were sitting and heard Bruce make a comment on the telephone using the number 49, which is a law enforcement code indicating that the person has an outstanding warrant. Sergeant Harrelson asked the defendant about the coins, and he appeared to be nervous. At that point, the defendant’s cell phone rang. He talked on the phone briefly, hung up and ran out of the office. Harrelson related the rest of the story in generally the same way as Deputy Bruce had and he described the area where the officers finally apprehended the defendant as a small alcove.
The following juror questions were submitted for Sergeant Harrelson: “Were the coins stolen? Why wasn’t Mr. Washington told what 49 meant? When Mr. Washington first left the office, were verbal commands to stop issued?” The trial judge asked only the second and third questions. Sergeant Harrelson answered these by saying that he did command the defendant to stop but did not tell him what code 49 means. He explained that officers do not ordinarily want a suspect to know that they are aware of the existence of warrants.
Deputy Rick Parraro testified that when he arrived on the scene, Sergeant Harrel-son and Deputy Bruce had the defendant on the floor trying to handcuff him. He was kicking and screaming, saying he wasn’t going to jail and refusing to walk on his own. When the two officers picked him up and carried him to the patrol car, he refused to get in and he was kicking his legs, flailing, jerking and screaming. Dep *1169 uty Parraro sprayed the defendant with pepper spray in an effort to get him under control. Once the defendant was in the car the officers put a hobble restraint around his feet to hold them together.
The following questions were submitted for Deputy Parraro: “How could Mr. Washington be fighting back with handcuffs on and hobbles on his feet? Who witnessed the jacket being searched? Was Mr. Washington told if he didn’t [calm] down that he would be sprayed? Why was Mr. Washington’s coat later searched?” The trial judge then said, “I will note for the record this series of questions come from juror McCoy. I have noted throughout the questioning that juror McCoy has repeatedly asked questions that were hostile, argumentative questions, not following the Court’s instructions on questioning. We’ll monitor the rest of the trial, but in all probability I’m going to take Ms. McCoy off the jury and substitute the alternate.”
Michelle Garber, a crime-lab analyst with the Florida Department of Law Enforcement, said she tested the suspected contraband and identified less than one gram of cannabis and half a gram of cocaine. She said the evidence was properly labeled and, when she was finished testing it, she returned it to the evidence technician. Ms. Garber testified that the evidence came in as a “rush case,” because it was headed for trial.
The trial judge informed the lawyers that there were three questions from juror McCoy that were not entirely clear but that the judge interpreted as, “Why was this evidence rushed? Was the evidence tampered? [sic] Why wasn’t all items fingerprinted? [sic].” The judge declined to ask any of the questions.
Tina Rivers, evidence custodian for the Leon County Sheriffs Department, testified about the procedures for destroying evidence. Her records showed that the cannabis and cocaine in this case had been destroyed. She did not remember who instructed her to dispose of these items but said it could have been an oral directive. Ms. Rivers also identified a subsequent order from the court approving destruction of the evidence. She said that destroying the evidence was a mistake, because this case had not been completed.
This testimony prompted another series of questions from juror McCoy: “What was [destroyed]? Why did the officer order the evidence to be destroyed verbally? Was the officer hiding something? Or covering up something?” Ms. Rivers said that she was not sure when the evidence was destroyed.
Sergeant Barry Blackburn, a Leon County Sheriffs Deputy and supervisor of the crime scene unit, testified that evidence is destroyed when it is no longer of any value. Sergeant Blackburn said that the evidence in this case was burned on February 2, 2005, which was a very unusual mistake. He believed the authorization must have been verbal and he explained further that the policy had since been changed to require written authorization.
The judge read to the attorneys a question from juror McCoy: “If this evidence has been closed and destroyed why is Mr. Washington being charged? There is no evidence or proof? [sic]” Deputy Bruce was recalled to the stand and did not know anything about why the evidence was destroyed. The court declined to ask the following question from juror McCoy: “Why is it that the only way to destroy evidence would be for the officer to call and have this done or judge ... ?[sic]”
The state rested and the defendant took the witness stand in his own defense. He told the jury that he found the coins on a closet shelf shortly after moving into a new *1170 apartment. He admitted that he tried to leave the bank but denied that he had physically resisted the officers at any time. When asked whether he was carrying any drugs when he went to the bank that day, the defendant replied that he was not.
When all of the testimony had been presented, the trial judge informed the lawyers that he intended to excuse juror McCoy. The trial court explained,
... [T]he only thing I need to decide is, as to Ms. McCoy, it’s my intention to replace Ms. McCoy with the alternate and tell Ms. McCoy she does not need to return.
I wasn’t originally paying too much attention to it, as to who was asking the questions and the nature of the questions, but since I began paying more attention to it, of the last seven witnesses that were called, my recollection is that Ms. McCoy was the only juror that asked any questions, a large majority of the questions asked by her were contrary to my instructions, showed a total lack of understanding of the testimony that had been presented, were generally argumentative and hostile questions.
I don’t think she is an appropriate juror to sit on this case. We have Ms. Thompson, who is our alternate. And I really don’t see any reason to bring Ms. McCoy back, just to excuse her at the end of the day tomorrow. But I’ll let y’all be heard on that.
Defense counsel objected to this proposal and argued that the juror had not given any indication that she could not be fair. He also noted that the judge’s practice of allowing jurors to ask questions of witnesses was “very unusual,” in that it enabled the court to “look into the thought patterns of the jurors.” The objection was overruled.
At that point the trial judge explained how he knew that the questions had been submitted by juror McCoy:
It may be a little puzzling how we know exactly which juror [is asking the questions]. It became very obvious because she was the only one writing questions. I think the handwriting is clear on the notes that they are all by the same juror. And there were at least three or four occasions where she was the only one writing questions at the end.
The trial judge excused juror McCoy from further service in the case and replaced her with an alternate juror. Following the closing arguments and jury instructions, the newly reconstituted jury panel retired to deliberate. The jury found the defendant guilty of resisting an officer with violence, not guilty of possession of cocaine and guilty of possession of marijuana. The trial judge sentenced the defendant to a term of imprisonment, and he now appeals to this court.
We begin by stating a principle that is not in dispute. Florida trial judges have discretion to allow jurors to submit questions to be asked of witnesses. See Morris v. State, 931 So.2d 821 (Fla.2006); Watson v. State, 651 So.2d 1159, 1163 (Fla.1994); Ferrara v. State, 101 So.2d 797 (Fla.1958). In these decisions, the Florida Supreme Court has authorized the practice, but it is important to point out that the court did not endorse it. The existence of discretionary authority to allow jurors to ask questions does not imply that juror questions must be allowed or even that they should be allowed.
This case presents a good example of the kinds of problems that can arise if the trial judge permits jurors to submit questions to be asked of the witnesses. The jurors may not fully understand the technical limits the judge has placed on their right to ask questions, they may ask more *1171 questions than the trial judge expected, and their questions may be ambiguous or confusing. Jurors do not know the rules of evidence or the procedures that must be followed in a trial. A question that seems proper to a juror may be regarded by the court or counsel as improper.
In addition to these general concerns, a question submitted by a juror may inadvertently open a window into the thought process of the juror. That might work against a juror who is simply attempting to get relevant information. Judges and lawyers ordinarily have no right to know what jurors are thinking during the course of a trial. If a question reveals that a juror is leaning one way or the other, and if that juror is subsequently removed from the panel, someone will inevitably question whether the juror was removed for the stated reason or because of the way the juror was leaning.
In the present case the state argues that a trial judge has discretion to remove a sitting juror for misconduct. We have no quarrel with this general proposition, but the fallacy in the state’s argument is that it assumes juror McCoy committed some act of misconduct. She did not. The trial judge believed that she had violated his instruction to limit the questions to those that would clarify a point. However, juror McCoy may have thought that she was merely seeking clarification. Perhaps the points that were not yet fully explained to her satisfaction had been covered in enough detail for the trial judge, but there is nothing in the record to suggest that juror McCoy was deliberately disobeying the trial judge’s instruction.
It is also possible that she was confused by the subsequent instruction given during the course of the testimony. After fielding the questions that had been directed to the first few witnesses, the judge told the jury, “Don’t send us questions about something this witness doesn’t know anything about as to what some other witness might know.” This instruction may have been difficult for any juror to follow. Unlike the lawyers, who have investigated the case and prepared for trial, the jurors are hearing the evidence for the first time. They cannot be expected to know what a particular witness knows or does not know.
The state argues that juror McCoy’s questions revealed a bias in favor of the defendant. We reject this argument, as well. Juror McCoy appears to have been skeptical of the state’s witnesses, but that does not mean that she could not be fair. Jurors are told that the defendant is presumed to be innocent and that the state has the burden of proving guilt beyond a reasonable doubt. It should come as no surprise then that some of them will have critical questions about the state’s evidence. Surely a juror does not demonstrate unfairness merely by asking sharp questions.
Moreover, given the series of blunders in the investigation of this case, we certainly could not conclude that juror McCoy’s skepticism was unreasonable. The police officers accidently destroyed the marijuana and the cocaine; the bank failed to retain the videotape from any of the thirteen cameras taking pictures in the lobby that day; and the defendant was not even charged with possession of stolen coins, the suspected offense that set all of these events in motion. Under these circumstances, any juror might have been doubtful. Juror McCoy asked a number of questions about the search of the defendant’s jacket and the discovery of the cocaine. The fact that the jury found the defendant not guilty of possession of cocaine suggests that juror McCoy was not the only one who had doubts about this charge.
*1172 Jurors are told that they must not form any definite or fixed opinion about the merits of a case until they have heard all of the evidence, the arguments of the attorneys and the instructions on the law. See Fla. Std. Jury Instr. (Crim) 2.1. There is nothing in the record to suggest that juror McCoy violated this instruction. She may have been forming impressions as she was hearing the evidence, but we do not know what she may have thought after hearing the entire case and discussing it with the other jurors. It would be unrealistic to assume that jurors do not form impressions as they are hearing evidence. That is not improper, so long as the juror does not decide the case before it is concluded.
It is true that juror McCoy asked many more questions than the judge was expecting, but that does not qualify as misconduct. In his initial instruction, the judge said, “You are not encouraged to ask a large number of questions.” This was not a command to limit the questions to a certain number. Perhaps juror McCoy’s idea of “a large number” was different from that of the trial judge. In any event, a judge who invites jurors to ask questions is not in a good position to remove a juror on the ground that a juror has asked too many questions. If juror questioning gets out of hand, the judge can stop it altogether; but that was not done here.
A party seeking to remove a juror for improper behavior in the course of a trial must first show that the juror’s actions amount to misconduct. See State v. Hamilton, 574 So.2d 124, 129 (Fla.1991); Ramirez v. State, 922 So.2d 386, 389 (Fla. 1st DCA 2006). Here, the trial judge removed the juror in the absence of a request by a party, but the standard is no different. Whether removal is initiated by a party or by the trial judge, a finding of misconduct requires evidence that the juror violated an order or instruction by the court.
If a juror has visited the scene of the crime, read news accounts of the crime or spoken to a witness out of court, the violation would be obvious, and the only matter left for the exercise of discretion would be to determine the appropriate remedy. In contrast, juror McCoy’s conduct was not clearly shown to be a violation of any order or instruction. Whether her questions were too numerous or too suggestive are very subjective issues. To say that she was guilty of misconduct would require a characterization that is a matter of opinion.
We are particularly unwilling to approve of the disqualification of a juror in a case in which the juror did not have an opportunity to respond to the claim of juror misconduct. The trial judge could have questioned juror McCoy to determine whether she thought that her questions complied with the questioning procedure or whether she was deliberately violating the procedure. Many potential issues of juror misconduct can be diffused in this way. See, e.g., England v. State, 940 So.2d 389 (Fla.2006) (after questioning the juror, the trial judge determined that the juror had not expressed a premature opinion of guilt); Coleman v. State, 484 So.2d 624 (Fla. 1st DCA 1986) (after questioning jurors, the trial court determined that they had not read newspaper articles in violation of a court order); Alfonso v. State, 443 So.2d 176 (Fla. 3d DCA 1983) (the trial judge questioned a juror and determined that he did not have improper contact with a police officer during the course of the trial). In contrast, the trial judge in the present case did not question the juror. The assumption that she had prejudged the case or could no longer be fair to the state is therefore unsupported by the record.
In some instances an error in removing a juror can be treated as harmless, *1173 if the juror is replaced by a duly selected alternate. For example, this court concluded in Orosz v. State, 389 So.2d 1199 (Fla. 1st DCA 1980), that any error in removing a sleeping juror was harmless, because the juror was replaced with an alternate selected during voir dire. However, this reasoning cannot be applied here. It would make little sense to conclude that it is error to reconfigure the jury panel based on nothing more than the perceived impressions a juror holds about the case, but that the error does no harm because the parties had previously selected the alternate juror. In this situation, the reconfiguration of the jury panel is the very error that must be corrected.
Another aspect of the problem presented by this case is that the other jurors may have suspected that juror McCoy was excused because she asked too many questions and was too critical of the state’s case. Given the sequence of events, the remaining jurors also might have inferred that the trial judge believed the defendant was guilty. Of course, this is an impression that trial judges work very hard to avoid. At the conclusion of every criminal trial, the judge tells the jury, “Please disregard anything I may have said or done that made you think I prefer one verdict over another.” Fla. Std. Jury Inst. (Crim) 3.11. The jury is not to be influenced by the trial judge’s opinion. Yet the removal of a juror who has asked questions may signal to the remaining jurors that the judge did not like the questions. From this, they may infer, correctly or incorrectly, that the judge holds a particular view of the case.
We are very concerned about the precedent we would be setting were we to approve of the decision the trial court made here. The judge in this case undoubtedly had good intentions, but it may look to others as though he manipulated the jury panel based on his own perception of a juror’s questions. The judge and jury each have different functions, and there are good reasons to ensure that they remain separate. The credibility of the process would be undermined if it appeared that a judge was deciding which jurors could serve based on the inclinations they may have shown by their questions.
Because the error in excusing juror McCoy is alone sufficient to warrant reversal, we need not resolve any of the other issues presented on appeal. However, our failure to address the other points should not be taken as approval. If the defendant testifies in the trial on remand, the prosecuting attorney should not be permitted to ask him if the state’s witnesses are lying. Nor should she be permitted to ask the defendant where he obtained the money to post bail or any other irrelevant question designed to impeach him on a collateral matter.
Reversed and remanded.
BROWNING, C.J., and WEBSTER, J., concur.